Michael **MORTKOWITZ** and Maria Mortkowitz, Plaintiffs,

v.

**TEXACO INC.**, a Delaware Corporation, Defendant.

Civ. No. C92–20213 EAI.

United States District Court, N.D. California.

Jan. 19, 1994.

Dana McRae, of McCutchen, Doyle, Brown & Enersen, San Jose, CA, for defendant Texaco.

Henry Mariani, San Jose, CA, for plaintiffs Michael and Maria Mortkowitz.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INFANTE, United States Magistrate Judge.

### I. INTRODUCTION

In this action property owners Michael and Maria Mortkowitz allege that their former tenant, Texaco, Inc. caused serious gasoline fuel contamination to their property while maintaining and operating a gasoline station on the property. Defendant seeks partial summary judgment as to seven of Plaintiffs' nine claims primarily on the grounds that the claims are barred by the applicable statutes of limitations.[1]

The motion was heard on December 13, 1993. Having considered the motion, opposition, and reply papers, and the comments of counsel, Defendant's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART as set forth below.

### II. BACKGROUND

The property which is the subject of this action is located at 1990 Los Gatos–Almaden Blvd., San Jose, California. It was leased to Texaco by the former property owners, Mario and Grace Canavero from July 1, 1956 through April of 1983. The lease, drafted and prepared by Texaco, provided in relevant part that the Canaveros would build a gasoline service station on the property for Texaco's use. The lease also provided that Texaco would furnish and retain title to, and the Canaveros would install gasoline pumps, two 4,000 gallon underground tanks, one 2,000 gallon underground tank, one 550 gallon waste oil tank, gallon lubricating outfits, and waste oil tanks. On May 1, 1967, Texaco and the Canaveros entered into a modification of the lease which provided that the Canaveros would modernize the service station, replace some but not all of the underground tanks, and install two additional tanks and associated piping.

In 1977, Plaintiffs purchased the property from the Canaveros subject to the Texaco lease. Thereafter, Texaco continued to operate a gasoline station on the property. Prior to the expiration of the lease, Texaco notified Plaintiffs of its intention to exercise its option to purchase the property. However, Texaco did not purchase the property and instead sold its equipment on the property to Plaintiffs on May 17, 1983. The Bill of Sale for the tanks provided in pertinent part:

> Texaco Inc., in the execution of this Bill of Sale, does not represent that said tanks are in repair or in good condition and these tanks are sold in the condition which they are in at the present time with-out any representation as to what that condition may be ... Those items described above as "used" are sold "as is." THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE FOREGOING DESCRIPTION OF THE PROPERTY.

For the next six years Plaintiffs leased the property to various tenants who also operated the gasoline service station.

On July 1, 1983, more than a month after Plaintiffs purchased the underground tanks, the Hazardous Materials Storage Ordinance, San Jose Municipal Code, Title 17, chapter 17.68 (the "HMSO"), became effective, and required owners of underground "storage facilities," defined to include tanks and "pipes," to outfit the facility with a monitoring system capable of detecting unauthorized releases of any hazardous substances, including gasoline, stored in the facility. In 1983, the California Legislature enacted a similar law requiring

1. The parties have consented that all proceedings in the above entitled case may be heard and finally adjudicated by the assigned magistrate judge pursuant to Rule 73, Fed.R.Civ.P. and 28 U.S.C. Section 636(c).

owners to outfit their underground tank systems, including "connecting piping," with a monitoring system capable of detecting unauthorized releases of any hazardous substances stored in the tank by July 1, 1985. California Health and Safety Code § 25292(a).

On November 1, 1988, Plaintiffs received a bona fide offer to purchase the property from Village Properties. During the buyer's investigation of the premises, Plaintiffs became aware of the existence and requirements of the San Jose HMSO. The buyer withdrew from the sale after testing disclosed that one of the underground storage tanks was in failure mode.

Plaintiffs later hired an engineering contractor to remove the underground fuel tanks. On April 11, 1989, five drained and emptied underground fuel tanks were removed from the property. Captain John Castro, Jr. of the San Jose Fire Department was present at the removal of the tanks, and testified at his deposition that he examined the tanks and did not find any evidence of any holes or cracks in the tanks or any evidence that there had been any leakage from the tanks. However, it was discovered that a loose pipe union in the piping system leading to the tanks had been leaking. As a result of the fuel leak, the Santa Clara Valley Water District (the "SCVWD"), the local agency in charge of investigation and remediation at fuel leak sites, required Plaintiffs to clean up the contamination on the property at their own cost and expense.

By letter dated March 29, 1990, Plaintiffs informed Texaco of the contamination on the property. Having received no response, Plaintiffs filed an action against Texaco regarding the contamination on the property on April 13, 1990.

During the course of discovery, Texaco produced documents to Plaintiffs which indicated that one of Texaco's station operators, Yaghaub Halelouyan, did not maintain gasoline inventory records from at least July 30, 1980 through April 8, 1983. Texaco also produced documents indicating that on July 11, 1980, a Texaco corrosion engineer/consultant named Warren Rogers prepared a report on the condition of Texaco's Cathodic protection system on the property.[2] Texaco also produced documents indicating that in 1982, Mr. Rogers also prepared, at Texaco's request, a report on the condition of the underground tank system and the probabilities that the tanks were leaking.

On October 5, 1992, the parties stipulated to the filing of Plaintiffs' First Amended Complaint. The Amended Complaint contains nine claims for relief: breach of contract; negligence; public nuisance; private nuisance; trespass; strict liability for an ultrahazardous activity; indemnification and declaratory relief; declaratory relief under federal law regarding liability; and fraud. Defendant asserts that it is entitled to summary judgment as to all of Plaintiffs' claims for relief except those for indemnification and declaratory relief.

### III. SUMMARY JUDGMENT STANDARD

Rule 56(c), Fed.R.Civ.P., provides that summary judgment shall be entered against the non-moving party if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The test to determine whether a motion for summary judgment should be granted "mirrors" that applied to a motion for a directed verdict:

> The trial judge must direct the verdict if, under governing law, there can be but one reasonable conclusion as to the verdict.

*Id.* at 250. Accordingly, in reversing a denial of summary judgment, the Supreme Court ruled:

> Where the record taken as a whole could not lead a rational trier of fact to find for

---

**2.** A "Cathodic protection system" uses anodes to attract corrosion away from the tanks, thereby increasing tank life.

the non-moving party, there is no "genuine issue for trial" under Rule 56(c).

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The burden of establishing the nonexistence of a "genuine issue as to any material fact" is initially on the party moving for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party's burden of demonstrating that it is entitled to judgment as a matter of law may be satisfied by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex, supra.*

Once the moving party properly supports its motion showing that it is entitled to judgment as a matter of law, the party opposing the motion must present affirmative evidence to establish a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex, supra; Lake Nacimiento Ranch Co. v. San Luis Obispo,* 841 F.2d 872 (9th Cir.1987). Furthermore, sufficient evidence must be produced upon which the jury could reasonably find for the nonmoving party based on the applicable evidentiary standards. *Anderson, supra.*

### IV. DISCUSSION

#### A. Plaintiffs' First Claim for Relief: Breach of Contract

Defendant asserts that Plaintiffs' first cause of action for breach of contract is barred by the four year statute of limitations for breach of contract claims provided by Code of Civil Procedure § 337.[3] Plaintiffs allege in their complaint that "Texaco impliedly covenanted to restore the premises to Mortkowitz unimpaired beyond ordinary

wear and tear," and that Texaco breached that covenant when it surrendered the premises in a polluted condition and incapable of full use for any purpose. (Complaint, ¶¶ 15, 16).

 In general, a cause of action for breach of contract accrues at the time of breach, and the statute of limitations begins to run at that time. *Donahue v. United Artists Corporation,* 2 Cal.App.3d 794, 83 Cal.Rptr. 131 (1969); *See also, Witkin, Cal.Procedure,* § 375, at 402 (3rd ed. 1985). If Texaco breached the implied covenant, the alleged breach would have occurred when Texaco's lease expired in April of 1983. *Donahue, supra.* Thus, the limitation period began to run in April of 1983, and expired by April of 1987, approximately three years before Plaintiffs filed suit on April 13, 1990.

 In their opposition, Plaintiffs appear to have completely abandoned their original breach of contract theory, raising for the first time a new breach of contract theory. They assert that the lease agreement contained an express provision to "indemnify and save the lessor harmless from and against all liability, damages and judgments arising from injury during the term herein to person or property occasioned by the acts or omissions of lessee," (the "indemnification provision"), and that Texaco breached this indemnification provision in April of 1990 when Texaco refused to accept responsibility for the clean-up costs imposed upon Plaintiffs by the SCVWD. Plaintiffs reason that their action for breach of the lease agreement is timely because it was brought within one year of Texaco's breach and within one year of notification by the SCVWD that Plaintiffs would be responsible for the clean-up costs.

Plaintiffs' new theory is not properly before the Court. It is not a part of the complaint nor can it be inferred from the allegations in the complaint. Moreover, at no time prior to the filing of the opposition papers to the motion for summary judgment did Plaintiffs indicate that this new theory was to be pursued. *See, Tucson Elec. Power*

---

**3.** All statutory references are to the California Code of Civil Procedure unless otherwise specified.

v. *Westinghouse Elec.*, 597 F.Supp. 1102 (D.Ariz.1984).

New allegations asserted in opposition to a motion for summary judgment may, in some circumstances, be treated as a motion to amend the complaint pursuant to Rule 15(a), Fed.R.Civ.P. *William Inglis, Etc. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1053, fn. 68 (9th Cir.1981), *citing, Sherman v. Hallbauer,* 455 F.2d 1236, 1242 (5th Cir. 1972). Rule 15(a) provides that leave to amend shall be freely given when justice so requires, and several factors are relevant to determine whether leave to amend should be granted, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposition party by virtue of the allowance of the amendment, [and] futility of amendment." *Schlacter–Jones v. General Telephone*, 936 F.2d 435 (9th Cir.1991). However, these issues are not addressed by either party in their motion papers. Therefore, the Court declines to treat Plaintiffs' new allegations as a motion to amend.

Since Plaintiffs' contract claim as alleged in their first amended complaint accrued in April of 1983 when Texaco vacated the property and the four year statute of limitation expired in April of 1987, Plaintiffs' claim is time barred. Accordingly, Defendant is entitled to summary judgment as to Plaintiffs' contract claim.

## B. *Plaintiffs' Second, Third, Fourth, Fifth & Sixth Claims for Relief*

Defendant asserts that Plaintiffs' claims for negligence, permanent nuisance, and permanent trespass are barred by the three year statute of limitations provided by Code of Civil Procedure § 338 for actions for trespass upon or injury to real property.[4] Defendant also asserts that even if the claims are not time barred, there is no evidence to support Plaintiffs' claims for negligence, pub-

lic nuisance, continuing nuisance, continuing trespass, and strict liability for an ultrahazardous activity. Defendant also asserts that the doctrine of strict liability for an ultrahazardous activity is not applicable to the maintenance and use of an underground gasoline storage system.

### 1. *Statute of Limitations Provided by C.C.P. § 338*

Whether Plaintiffs' claims for negligence, permanent nuisance, permanent trespass, and strict liability for an ultrahazardous activity are time-barred depends on when the cause of action accrued.[5] *Leaf v. City of San Mateo*, 104 Cal.App.3d 398, 163 Cal.Rptr. 711 (1980). The question of when a cause of action accrues is a mixed question of law and fact. *Id.* The traditional rule in tort cases is that the applicable limitation period will run from accrual of the action "upon the occurrence of the last element essential to the cause of action." *CAMSI IV v. Hunter Technology Corp.*, 230 Cal.App.3d 1525, 1534, 282 Cal.Rptr. 80 (1991). In the case of injury to real property, the statute of limitations runs from the date of the act causing "immediate" and "permanent" injury. *Id.* For purposes of the statute of limitations, "the harm implicit in a tortious injury to property is harm to the property itself." *CAMSI IV*, 230 Cal. App.3d at 1535, 282 Cal.Rptr. 80. If the injury to the property is caused by a series of acts by the defendant, the general rule is that the statute of limitations runs from the date of the last act. *Id.*

Plaintiffs allege that the pollution was caused during the 27 years that the property was leased to Texaco (Complaint, ¶ 11), and thus, implicitly allege that the polluting continued until the lease expired and Texaco vacated the property in April of 1983. Under the traditional rule, the three year statute of limitations commenced no later than April of 1983 and expired by April of 1986,

---

**4.** Defendant does not argue, however, that Plaintiffs' claims for *continuing* nuisance and *continuing* trespass are barred by the statute of limitations.

**5.** Although not asserted by Defendant, Plaintiffs' sixth claim for strict liability for an ultrahazar-

dous activity is subject to the same three-year statute of limitations provided by Section 338 for actions for injury to real property. *Wilshire Westwood Associates v. Atlantic Richfield Co.*, 20 Cal.App.4th 732, 24 Cal.Rptr.2d 562 (1993).

almost four years before Plaintiffs filed suit on April 13, 1990. *Id.*

Plaintiffs, however, assert that they may invoke the so-called "discovery rule" to delay commencement of the limitation period until 1989, when they first became aware of the contamination on the property. The "discovery rule" postpones the commencement of the limitation period until "the plaintiff discovers or should have discovered all facts essential to his cause of action [citations]." *CAMSI IV,* 230 Cal.App.3d at 1536, 282 Cal.Rptr. 80. More specifically, commencement of the limitation period is postponed until either (1) the plaintiff actually discovers his injury and its negligent cause; or (2) could have discovered injury and cause through the exercise of reasonable diligence. *Id.* Subjective suspicion is not required. *Mangini v. Aerojet–General Corp.,* 230 Cal. App.3d 1125, 1150, 281 Cal.Rptr. 827 (1991). If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation. *Id.*

The "discovery rule" is meant to ameliorate the harshness of the traditional application of the statute of limitations where it would be "manifestly unjust to deprive a plaintiff of a cause of action before he is aware he has been injured." *Mangini,* 230 Cal.App.3d at 1150, 281 Cal.Rptr. 827, *citing Leaf, supra.* Thus, the rule protects the plaintiff who is 'blamelessly ignorant' of his cause of action. [Citations]" *Leaf,* 104 Cal. App.3d at 408, 163 Cal.Rptr. 711. The rule is "based on the notion that statutes of limitations are intended to run against those who fail to exercise reasonable care in the protection and enforcement of their rights; therefore, those statutes should not be interpreted so as to bar a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence. [Citations]" *CAMSI IV,* 230 Cal. App.3d at 1536, 282 Cal.Rptr. 80. The rule has been applied in various tort actions, including those involving nonobvious or latent injuries to real property. *See e.g., CAMSI IV, supra; Allen v. Sundean,* 137 Cal.App.3d

216, 186 Cal.Rptr. 863 (1982); *Leaf v. City of San Mateo,* 104 Cal.App.3d 398, 163 Cal. Rptr. 711 (1980).

A plaintiff who intends to rely on the "discovery rule" must specifically plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence. *CAMSI IV, supra.* Mere conclusory assertions that delay in discovery was reasonable are insufficient. *Id.* Defendant asserts that the allegations in Plaintiffs' complaint are insufficient to establish the applicability of the "discovery rule." However, at the summary judgment stage, the sufficiency of Plaintiffs' allegations are no longer reviewed in the abstract, but are tested in light of the evidence submitted by the parties.

It is undisputed that Plaintiff did not have actual knowledge of the leaking pipe union or contamination until April of 1989. Thus, the only issue is whether Plaintiffs should have discovered, through the exercise of reasonable diligence, the contamination on the property and its cause any earlier. Defendant asserts that the exercise of reasonable diligence would have led to the discovery of contamination on the property by at least 1985, when Plaintiffs should have complied with California Health and Safety Code § 25292(a).

In *Mangini, supra,* the Court of Appeals faced a similar issue. In that case, the plaintiffs, landowners, alleged that a former lessee had contaminated the property with waste rocket fuel and other hazardous substances during the leasehold. The Court of Appeals for the Third District held as a matter of law that a combination of three facts was sufficient to put the plaintiffs on notice of the possibility that defendant had dumped hazardous waste on their land: (1) a recorded lease gave notice that the defendant had engaged in activities of a potentially hazardous nature on their land; (2) the Department of Justice investigated defendant's practices regarding disposal of hazardous waste in the area; and (3) the defendant asked plaintiffs for permission to inspect their property. *Mangini,* 230 Cal.App.3d at 1152, 281 Cal. Rptr. 827. The Court also stated, "Whether

any of these three facts in isolation would be sufficient to impart notice is open to dispute." *Id.*

Similarly, in *CAMSI IV, supra,* the Court of Appeals for the Sixth District held that the plaintiff was not entitled to the benefit of the "discovery rule" because (1) a Regional Board order was issued which "mandated investigation of the groundwater and soil" of the property; and (2) the plaintiff was aware of contamination on certain portions of their property. The Court reasoned, "Given notice of the present of TCE [trichloroethene] or other VOCs [volatile organic chemicals] anywhere on the property, the owner could properly be expected, in the exercise of reasonable diligence, to conduct an adequate investigation of all parts of its property and particularly of former manufacturing sites." *CAMSI IV*, 230 Cal.App.3d at 1537–38, 282 Cal.Rptr. 80.

In the present case, the exercise of reasonable diligence by the Plaintiffs would have led to the discovery of contamination on the property no later than July 1, 1985. In 1983, the year Texaco vacated the property, the California Legislature enacted strict requirements for the underground storage of hazardous substances, including gasoline. Health and Safety Code § 25280 *et seq.,* Chapter 6.7. The Legislature's intent in enacting the new statutory scheme was set forth in great detail:

(1) Substances hazardous to the public health and safety and to the environment are stored prior to use or disposal in thousands of underground locations in the state.

(2) Underground tanks used for the storage of hazardous substances and wastes are potential sources of contamination of the ground and underlying aquifers, and may pose other dangers to public health and the environment.

(3) In several known cases, underground storage of hazardous substances, including, but not limited to, industrial solvents, petroleum products, and other materials, has resulted in undetected and uncontrolled releases of hazardous substances into the ground. These releases have contaminated public drinking water supplies and cre-

ated a potential threat to the public health and to the waters of the state.

. . . . .

(5) The protection of the public from releases of hazardous substances is an issue of statewide concern ...

(b) The Legislature therefore declares that it is in the public interest to establish a continuing program for the purpose of preventing contamination from, and improper storage of, hazardous substances stored underground. It is the intent of the Legislature, in enacting this chapter to establish orderly procedures that will ensure that newly constructed underground storage tanks meet appropriate standards and that existing tanks be properly maintained, inspected, tested, and upgraded so that the health, property, and resources of the people of the state will be protected.

Health and Safety Code § 25280 (current version). The new legislation required owners and operators of an "underground storage tank"—defined to include pipes connected to the tanks—to obtain a permit to own or operate an underground storage tank from the local agency. Health and Safety Code § 25283 (amended 1984, 1989, and 1992; current version at § 25284). Plaintiffs were also specifically required to meet the following conditions:

For every underground storage tank installed on or before January 1, 1984, and used for the storage of hazardous substances, the following actions shall be taken:

(a) On or before *July 1, 1985,* the owner shall outfit the facility with a monitoring system capable of detecting unauthorized releases of any hazardous substances stored in the facility ...

(b) Provide a means for visual inspection of the tank, wherever practical, for the purpose of the monitoring required by subdivision (a).

Health and Safety Code § 25284.1 (amended 1984, 1986, 1987, and 1989; current version at § 25292). As owners of the underground tank system, Plaintiffs were further required to (1) provide a copy of the permit to the gas station operator (Plaintiffs' lessee), (2) enter

into a written contract with the gas station operator requiring the gas station operator to monitor the tank system, and (3) notify the gas station operator in writing of the civil and criminal penalties for noncompliance. Health and Safety Code § 25284.2 (amended 1984 and 1989; current version at § 25293). The legislation also imposed civil penalties of not less than five hundred dollars ($500) or more than five thousand dollars ($5,000) per day upon owners who failed to comply with all statutory requirements for owning and operating underground storage tanks. Health and Safety Code § 25287 (amended 1984, 1986, 1988, 1991; current version at § 25299).

Thus, by 1985, Plaintiffs were subject to a statutorily defined duty of inquiry imposed by the Health and Safety Code, which was similar in nature to the duty of inquiry imposed upon the plaintiffs in *Mangini* by the Department of Justice. *See also CAMSI IV, supra* (Regional Board ordered plaintiff to investigate the groundwater and soil of the property). Plaintiffs could properly be expected to have exercised reasonable diligence by conducting an investigation of their property to determine the extent of any contamination on the property and the source of the contamination as required by law.[6] A plaintiff who fails to comply with an explicit statutory mandate enacted to discover precisely the type of harm which the plaintiff alleges is not "blamelessly ignorant" of his cause of action, and cannot claim the benefit of an equitable rule designed to ameliorate the harshness of the traditional application of the statute of limitations.[7]

Furthermore, when Texaco vacated the property and sold the underground tanks to Plaintiffs, Plaintiffs were aware that the property had been utilized as a gasoline station continuously for twenty-seven years, and that some of the original underground tanks and piping, installed in 1956, were still being utilized. The knowledge that the property had been utilized as a gasoline station for over twenty-seven years with some of the original tanks and piping should have put Plaintiffs on inquiry about possible soil contamination notwithstanding the duty of inquiry imposed upon them by law.

The combination of Plaintiffs' knowledge of the age of the underground tank system along with the statutory duty of inquiry imposed upon all owners and operators of underground tanks establishes as a matter of law that Plaintiffs should have been on notice of the possibility that their property may have been contaminated and that Texaco may have caused some or all of the contamination. *See e.g. Mangini, supra.* Therefore, the statute of limitations on Plaintiffs' claims for negligence, permanent nuisance, permanent trespass, and strict liability began to run no later than July 1985, and expired in July 1988, nearly two years before Plaintiffs

6. Defendant also asserts that the exercise of reasonable diligence would have led to the discovery of contamination on the property if plaintiffs had complied with the San Jose HMSO. However, it is questionable whether Plaintiffs had reason to know that the Ordinance applied to their property. Plaintiffs have submitted a letter dated November 22, 1988 from Clifford A. Young, Inspector, Hazardous Materials Division, San Jose Fire Department to Village Properties stating in relevant part:

Our office has researched our database in response to your Public Information Request (PIR # 344). The initial site address referenced in your request was not found in our database. The site address you listed initially is in an area bordering San Jose, Los Gatos, and Santa Clara County. Our Hazmat database covers only businesses located within the San Jose city limits. It was concluded the business was, therefore, in Los Gatos or Santa Clara County jurisdiction.

On Thursday, November 17, 1988, you phoned with new site address information. The new site address you gave was 1990 Los Gatos. I reexamined our database as you requested and located the Arco Station you were seeking information about in our files. The file folder indicated the station is there, but no hazardous materials information is stored. Based upon the information in the file, the Arco Station was at one point in the jurisdiction of the Town of Los Gatos. It now appears the area has been annexed to the City of San Jose, but has not been included in our Hazmat database. Thank you for making our Department aware of the over sight. The situation is now in the process of being corrected. The owner/operator of the Arco Station will be contacted about compliance with the San Jose Hazardous Materials Storage Ordinance.

7. *See*, page 1238, *supra*, for discussion of the application of the discovery rule.

filed suit in April 1990.[8]

### 2. Continuing Nuisance & Continuing Trespass

While Plaintiffs' claims for permanent nuisance and permanent trespass are time barred, Plaintiffs' claims for *continuing* public and private nuisance and *continuing* trespass are not time barred. *Mangini, supra; CAMSI IV, supra; Wilshire Westwood Associates, supra.*

However, Texaco asserts that there is no evidence to support Plaintiffs' claims for continuing nuisance, public nuisance, and continuing trespass. The crux of Defendant's argument is that Plaintiffs have no evidence that Texaco installed the leaking pipeline. In support of its position, Texaco has submitted a copy of a building permit from the Santa Clara County Building Inspection Department dated May 28, 1956 which indicates that a contractor named Oscar Liebert built the service station.

Texaco also denies installing any replacement tanks and piping as part of the modernization of the gasoline station in 1967. Texaco has submitted a letter from Oscar Liebert to Texaco dated May 1, 1965 which sets forth the total cost of the service station construction and equipment. Texaco has also submitted a letter from Texaco to the Canaveros dated May 14, 1968 indicating that Texaco accepts the "work of rehabilitation of the service station facilities" as complete. However, neither of the documents conclusively establishes that the Canaveros were responsible for the installation of tanks and piping. Furthermore, Texaco admits that it has been unable to locate any documents indicating who installed the new tanks and pipes.

Plaintiffs assert several arguments in rebuttal, and in particular, point to the declaration of former property owner Grace Canavero which states:

During all of the time that Mario A. Canavero and/or I leased the aforesaid premises to Texaco, it exercised sole and exclusive control over the furnishing, installation, replacement, maintenance and repair of the several underground fuel tanks located on the premises. At all times, Texaco exercised sole control in removing and/or replacing such fuel tanks as were removed or replaced during the time that Mario A. Canavero and/or I leased the aforesaid premises to Texaco.

Plaintiffs also propounded interrogatories upon Texaco during the course of discovery, specifically asking what repairs, reconstructions or upgrades were furnished by Texaco for the product storage and delivery systems at the subject property between the years 1956 and May 1983. Texaco responded stating that it "installed pipes and fittings, installed vapor recovery system, installed submerged pumps, installed dispensers, installed pumps, installed two underground tanks and rehabilitated station." Furthermore, it is significant that Texaco did not object to a previous order by the Honorable Robert F. Peckham, United States District Judge, filed September 28, 1990 in which the Court found, that Texaco "furnished, installed, and replaced certain underground fuel tanks," and that "[d]uring the term of the Lease, Texaco exercised sole control over the furnishing, installation, maintenance, and repair of the underground fuel tanks."

 Plaintiffs have successfully raised genuine issues as to whether the Canaveros or Texaco installed the original underground tanks and piping; whether the Canaveros or Texaco installed the replacement tanks in 1967; and whether the piping was replaced at all in 1967. Plaintiffs' evidence provides a sufficient basis upon which a jury could reasonably find that Texaco was responsible for the installation of the leaking pipeline.

 However, Defendant also asserts as an affirmative defense that the Canaveros

---

**8.** Defendant asserts as an alternative ground for summary judgment that Plaintiffs' claims are barred by the ten year statute of limitations provided by Section 337.15 for claims based on latent defects in construction of real property. Since Plaintiffs' four claims are time barred by Section 338, the Court need not consider the applicability of Section 337.15. The Court also need not consider the sufficiency of evidence supporting Plaintiffs' claims, nor consider whether the operation of a gasoline service station with underground storage tanks constitutes and ultrahazardous activity for purposes of the tort of strict liability.

consented to Texaco's use of the property as a service station. As a general rule, consent is a defense to claims of trespass and nuisance. *Mangini, supra.* In this case, however, there is no evidence that the Canaveros specifically consented to Texaco's use of the leaking pipeline, despite their general consent to the use of the property as a service station. Accordingly, Plaintiffs may pursue their claims for continuing nuisance, public nuisance and continuing trespass, but their recovery is limited to those damages sustained within the three years prior to the commencement of this action in April 13, 1990. *Mangini, supra; Torrance Redevelopment Agency v. Solvent Coating,* 781 F.Supp. 650 (C.D.Cal.1991).

## C. Plaintiffs' Ninth Claim for Relief: Fraud

■■■ Plaintiffs must prove the following elements to maintain their fraud claim: (1) willful concealment of a known fact by one bound to disclose it; (2) intent to induce reliance; (3) justifiable reliance; and (4) resulting damage. Civil Code §§ 1709, 1710; *Continental Airlines Inc. v. McDonnell Douglas Corp.,* 216 Cal.App.3d 388, 404, 264 Cal.Rptr. 779 (1989).

Texaco asserts that it is entitled to summary judgment as to Plaintiffs' claim for relief because (a) there is no evidence that Texaco knew of any leaks in the underground tanks or the pipe union before they were sold to Plaintiffs; (b) Texaco did not induce Plaintiffs to purchase the tanks, but instead notified Plaintiffs of its intent to exercise the option to purchase the property as provided for in the lease; and (c) since the tanks were found to be intact on removal and could not have been the cause of contamination, Plaintiffs cannot prove causation.

Texaco relies primarily on a number of letters exchanged between Texaco and Mr. Mortkowitz from February 24, 1982 to August 12, 1982 which indicate that Texaco notified Plaintiffs of its intent to exercise the option to purchase the property under the

lease, and that Mr. Mortkowitz opposed the proposed purchase. However, the sale of the underground tanks was not completed until May of 1983. Thus, Texaco's letters, sent approximately nine months prior to the completion of the sale, do not necessarily negate Texaco's intent to defraud Plaintiffs.

In contrast, Plaintiffs have described in detail Texaco's failure to disclose four material facts which would have affected their desire to go forward with the purchase of the tanks: (1) that Texaco's station operator Yaghaub Halelouyan had refused to provide Texaco with quarterly inventory reconciliation records within the year preceding Plaintiffs' purchase; (2) that the anodes in the Cathodic protection system on the site had deteriorated and had a short life left; (3) that the cathodic protection system was probably not effective because it was installed on "already corroded tanks"[9]; and (4) that a study of the corrosion life of the tanks commissioned by Texaco in 1982 indicated that the tanks on the premises had a "probability of leaking" of 0.9360, and that one year later, the probability increased to 0.9856. Plaintiffs assert that all of this information was available to Texaco prior to the completion of the sale on May 17, 1983. In particular, Plaintiffs have presented evidence that the analysis of the field test data for the 1982 study was completed on March 23, 1983, and therefore available to Texaco prior to the completion of the sale.

Plaintiffs have presented sufficient evidence upon which a jury could find that Texaco concealed material information with the requisite intent to induce Plaintiffs to purchase the tanks from Texaco. Furthermore, Plaintiffs contend that if the information had been disclosed, it would have materially affected (1) their decision to preclude Texaco from exercising its option to purchase the property for $120,000 as provided in the modification to the lease; and (2) their decision to purchase the underground tanks from Texaco for $20,000. Accordingly, Defen-

---

9. Plaintiffs rely on the expert opinion of George Nekoksa that (1) the anodes in the cathodic protection system installed on the property had deteriorated and had a short life left, and (2) that the cathodic protection system was probably not effective because it was installed on already corroded tanks. Defendant objects to these opinions on the grounds that they lack foundation.

dant's motion for summary judgment as to Plaintiffs' claim for fraud is denied.

*D. Plaintiffs' Request for Punitive Damages*

Civil Code Section 3294 provides that "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff ... may recover damages for the sake of example and by way of punishing the defendant." As discussed immediately above, there is sufficient evidence upon which a jury could find that Texaco fraudulently induced Plaintiffs to purchase the tanks. Accordingly, Defendant's motion for summary judgment as to Plaintiffs' claim for punitive damages is denied.

## V. CONCLUSION

Texaco's motion for summary judgment is granted in part and denied in part. Texaco is entitled to summary judgment as to Plaintiffs' claims for negligence, permanent nuisance, permanent trespass, and strict liability for an ultrahazardous activity on the grounds that such claims are barred by the statute of limitations provided by Code of Civil Procedure Section 338.

However, Plaintiffs have successfully established genuine issues of material fact which preclude the entry of summary judgment on their claims for continuing nuisance, public nuisance, continuing trespass, fraud and punitive damages.

**IT IS SO ORDERED.**