UNIVERSAL AVIONICS SYSTEMS CORPORATION, an Arizona corporation, Plaintiff,

v.

ROCKWELL INTERNATIONAL CORPORATION, a Delaware Corporation; Rockwell Collins, Inc., a Delaware Corporation, Defendants.

No. CIV. 97–028 TUC ACM.

United States District Court, D. Arizona.

July 17, 2001.

---

William H. Barrett, McDermott, Will &
Emery, Washington, DC, Timothy R.
Smock, Richards & Smock, Phoenix, AZ,
Robert E. Kohn, McDermott, Will & Em-

ery, Los Angeles, CA, Brian A. Weinberger, Weinberger Law Firm, Scottsdale, AZ, for plaintiff.

Jeffrey Willis, Snell & Wilmer LLP, Tucson, AZ, John D. Briggs, III, Edward Bruce Schwartz, Kenneth Wade Donnelly, Jason Christopher Raofield, James Kress, Howry Simon Arnold & White, LLP, Washington, DC, Robert E. B. Allen, Charles Steven Price, Allen, Price & Padden PLC, Phoenix, AZ, for defendants.

## ORDER

MARQUEZ, Senior District Judge.

Universal Avionics Systems Corporation ("Universal" or "Plaintiff") brings this action against Rockwell International Corporation and Rockwell Collins, Inc. ("Collins" or "Defendants") alleging numerous antitrust violations. Specifically, Universal alleges violation of § 2 of the Sherman Act—attempted monopolization,[1] violation of § 1 of the Sherman Act,[2] and § 3 of the Clayton Act[3]—exclusive dealing, contracts in restraint of trade, and tying arrangements. Universal also advances two claims under Arizona common law—tortious interference with business relationships and prospective economic advantages, and unfair competition and business practices. Collins asserts three counterclaims against Universal—defamation *per se*, defamation *per quod*, and unfair competition.

Pending before the Court are cross-motions for summary judgment, one filed by Universal and five filed by Collins. This Order will address only the merits of Collins' Motion for Partial Summary Judgment and for Other Relief Relating to Plaintiff's Asserted "Lock-in" Submarkets ("Lock–In Motion"). Because the Court grants Collins' Lock–In Motion and thus, declines to define the relevant market as proposed by Universal, as including FMSs for aircraft equipped with a Collins integrated FCSs, the Court finds it unnecessary to comment on the merits of the remaining motions.

Judgment as a matter of law is available "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. Rule 56(c). The initial burden is on the moving party to show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the initial showing has been made, the burden shifts to the non-moving party to designate specific facts showing there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

In deciding whether there is a material issue of fact, the court must believe the

---

1. Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ..." 15 U.S.C. § 2 (West 2001).

2. Tying arrangements are declared illegal under Section 1 of the Sherman Act. That section reads, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the

several States, or with foreign nations, is hereby declared to be illegal ..." 15 U.S.C. § 1 (West 2001).

3. Section 3 of the Clayton Act provides that "[i]t shall be unlawful for any person ... to lease or make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor ... of the lessor or seller, where the effect ... may be to substantially lessen competition or tend to create a monopoly." 15 U.S.C. § 14 (West 2001).

nonmoving party's evidence, must draw all justifiable inferences in its favor, and assume that its nonconclusory version of any disputed issues of fact are correct. *Multistate Legal Studies, Inc. v. Harcourt Brace Publ., Inc.,* 63 F.3d 1540, 1545 (10th Cir.1995).

While summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, if there is no genuine issue of material fact, and if the resisting party does not present a record sufficient to support a reasonable finding in its favor, a district court has a duty to grant the motion for summary judgment. *Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1260 (9th Cir.1983).

## I. *Introduction*

Collins develops, manufactures, and sells avionics and communications equipment. It markets and sells most of its products directly to airframe manufacturers ("OEMs") for installation in new aircraft. Collins also sells directly to aircraft purchasers or "end-users."

Among the products that Collins manufactures and sells are flight control systems ("FCSs") and flight management systems ("FMSs") for general aviation aircraft, planes with fewer than 100 seats. The FCS is the center or core of the avionics system of an aircraft. It is where the autopilot resides. Since the FCS is the heart of the system, all of the other components comprising the avionics system must be able to communicate or interface with the FCS.

The middle level of the avionics system houses the navigation avionics such as the FMS. Essentially, the FMS collects and processes data from various sensors and antennae on an aircraft, such as wind speed, velocity, and location, and displays the data on monitors located in the cockpit of the aircraft. The FMS also communicates with the autopilot and the FCS of the aircraft. An FMS is used together with the FCS to assist the pilot in making navigational and other flight decisions.

Collins manufactures and sells its FCS under the names "Pro Line 4" and "Pro Line 21." The company offers its FMS as part of an integrated Pro Line 4 and Pro Line 21 shipset.[4] It does not sell its FMS as a separate stand alone unit. Collins' system was designed to give the owner of an aircraft the option of installing the Collins FMS or a different vendor's FMS in their aircraft. Thus, a non-Collins FMS can be integrated with a Collins Pro Line 4 and Pro Line 21 to the same extent as a Collins FMS can be integrated with its own Pro Line 4 and Pro Line 21. But in order to install a Universal or any non-Collins FMS to operate with a Collins Pro Line 4 or Pro Line 21, the FMS must be able to interface or communicate with the Pro Line 4 and Pro Line 21 shipset. To accomplish this interface, Universal, or any other manufacturer of FMSs, needs access to Collins' technical interface data or "data dictionary." Without access to this crucial instruction manual, Universal alleges that it cannot sell its FMS for aircraft equipped with a Collins integrated FCS, such as the Pro Line 4 and Pro Line 21.

Universal manufactures and sells aviation electronic products including FMSs but does not sell its own FCSs. Universal sells its FMSs to OEMs and end-users for installation on aircraft equipped with FCSs manufactured by Collins as well as those manufactured by other companies. Universal contends that by imposing contractual restrictions on disclosure and use of

4. Although Universal refers to Collins shipsets as "flight control systems," the FCS is part of the Pro Line 4 and 21 shipset; it does not comprise the entire unit. Collins has accepted Universal's nomenclature for purposes of the pending motions.

their "data dictionary," Collins prevented JCAB, TAG, Air Canada, Saab, Bombardier, and Raytheon from purchasing a Universal FMS to be interfaced with a Collins FCS.

## II. Defining the Relevant Product Market

Universal argues that Collins has violated the antitrust laws in three ways: 1) by attempting to monopolize, and actually monopolizing,[5] the sale of FMSs for aircraft equipped with a Collins FCS; 2) by tying the sale of a Collins FCS to the purchase of an inferior and more expensive Collins FMS; and 3) by entering into exclusive dealing arrangements with OEMs that require OEMs to buy and install Collins FMS products.

Defining the relevant product market is a fundamental element of each of these antitrust claims. *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 994 (11th Cir.1993) ("Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2."); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 18, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) ("In sum, any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact."); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,* 676 F.2d 1291, 1300 (9th Cir.1982) ("A definition of a relevant market was necessary in order to assess possible Sherman Act violations," namely exclusive dealing).

Collins contends that the relevant market is the general aviation FMS market, as alleged in Universal's First Amended Complaint ("Complaint"). Universal argues a "submarket" consisting of FMSs for aircraft equipped with a Collins integrated FCSs, the Pro Line 4 and Pro Line 21 systems.

## III. Universal's Failure to Plead or Otherwise Disclose a Submarket

In its Complaint, Universal defined the relevant product market as follows: The relevant market in which Universal has sustained injury is the design, manufacture, sale and servicing of navigation avionics for new non-military (i.e., non-MIL-SPEC) general aviation jet, multi-engine turbine-propelled, regional transport and twin-engine helicopter aircraft. One of the submarkets within this relevant market is the retrofit[6] market for the same avionics for the same aircraft.

---

5. Universal's Complaint alleges only an *attempt* to monopolize and not actual monopolization. Universal does not adequately defend its delay in raising this claim. Because of the prejudice to Collins, the Court would not be inclined to grant Universal leave to amend under Fed.R.Civ.P. 15(b). In any event, an amendment would be futile because Universal's actual monopolization claim would fail. As will be explained herein, Universal cannot show monopoly power under the relevant market alleged in it's Complaint. *See Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir.1997) (The requirements of a monopolization claim are similar to those of an attempted monopolization, differing primarily in the requisite intent and the necessary level of monopoly power. To prove actual monopolization, a plaintiff must prove that the defendant possessed monopoly power in the relevant market and willfully acquired or maintained that power. Both claims require a showing of monopoly or market power in a relevant market.).

6. "Retrofits" are installations of new parts or equipment not installed at the time of manufacturing. For example, an end-customer who has a Collins FMS installed on their aircraft and wishes to replace it with a non-Collins FMS, can "retrofit" the non-Collins FMS into the aircraft. If an end-customer takes delivery of the aircraft from the OEMs factory with no FMS installed, they can likewise "retrofit" their aircraft with an FMS at a

(Complaint ¶ 11.) No other relevant markets or submarkets were ever pled by Universal.

Unclear as to the definition of "navigation avionics," Collins filed a Motion for More Definite Statement. The Court denied the request and ruled that explanation of the relevant market was more properly the subject of discovery.

Discovery proceeded and by letter of January 30, 1998, counsel for Universal defined "navigation avionics" as "flight control systems (or what defendants refer to as 'shipsets') and flight management systems." Three weeks after Universal defined navigation avionics to include both FCSs and FMSs, Universal responded to Collins' Request for Admissions by agreeing that FCSs are *not* in the same relevant market as FMSs for purposes of Universal's attempted monopolization claim, by denying that the relevant market was the market for "navigation avionics for new, non-military (i.e., non-MIL-SPEC) general aviation jet, multi-engine turbine propelled, regional transport and twin engine helicopter aircraft on which a Collins FCS had been installed," and by admitting that the relevant market is *not* the market for "navigation avionics for new, non-military (i.e.non-MIL-SPEC) general aviation jet, multi-engine turbine-propelled, regional transport and twin engine helicopter aircraft on which a Collins FCS has been installed."

Later that year, in April of 1998, counsel for Universal wrote to counsel for Collins and stated that the term "navigation avionics" as used in Universal's Complaint, "means and refers to the following prod-

ucts for purposes of Universal's claims: flight management systems."

While Universal later amended its responses to several of Collins' Request for Admissions, Universal never amended its responses reference the definition of the relevant market. Nor did Universal ever move to amend its Complaint to allege a submarket.

In September of 1998, Universal submitted its economics expert report. With respect to the term "navigation avionics," Professor Smith explained that it made no sense to combine other navigation avionics with FMSs into a larger "navigation avionics" market, because most of these navigation systems do not perform many of the functions that customers value highly and expect of an FMS. Professor Smith opined that there was a relevant *submarket* for FMSs on board aircraft equipped with Collins FCSs and concluded that "Collins' conduct and its strategic documents provide evidence of its intent to monopolize the submarket for FMSs on aircraft equipped with Collins' FCSs." [7]

Throughout its pleadings, Collins accepted and used Universal's definition of the relevant market as the market alleged in Universal's Complaint—FMSs installed on *general aviation aircraft*. Despite having expressly denied the existence of a lock-in submarket in its Answers to Collins' Request for Admissions, Universal now argues a new market—a submarket consisting of FMSs for aircraft equipped with a Collins integrated FCSs, the Pro Line 4 and Pro Line 21 systems. To date, Universal has made no effort to justify its failure to plead or otherwise disclose this submarket.[8]

---

completion center at some point after they have taken delivery of the aircraft.

**7.** Professor Smith also testified that he did not believe that Collins could monopolize the FMS market on general aviation aircraft, the relevant market pled by Universal in its Complaint.

**8.** The Court finds no merit to Universal's argument that it denied the existence of a lock-in market in response to Collins' Requests for Admissions because Collins did not specify that it was asking whether the market was for FMSs to be used with an "integrated" Collins FCSs. Universal's Opposition at 37–40. Nor does the Court find that the parties tried

The Court finds that Universal did not properly raise the asserted lock-in market. Universal is precluded from attempting to prove and rely upon this submarket as the relevant product market. On this basis alone, Collins is entitled to judgment on all of Universal's antitrust claims.[9] *See Reisner v. General Motors Corp.*, 671 F.2d 91, 98 (2nd Cir.1982) (plaintiff not allowed to pursue his claim at trial in part because "the record discloses that Reisner continually changed his allegations concerning the relevant markets and failed to answer properly GM's interrogatories"); *Tucson Elec. Power v. Westinghouse Elec.*, 597 F.Supp. 1102, 1104 (D.Ariz.1984) ("The liberal pleading policy in the Rules prevents dismissal of a meritorious action for purely formal or technical reasons. The district court is not required, however, to speculate over the nature of plaintiffs' claim or to refuse to enter summary judgment for the defendant simply because the plaintiffs may, theoretically, be entitled to recover under a cause of action based on facts never alleged in the complaint."); *Mortkowitz v. Texaco Inc.*, 842 F.Supp. 1232, 1236 (N.D.Cal.1994) ("Plaintiffs' new theory is not properly before the Court. It is not a part of the complaint nor can it be inferred from the allegations in the complaint. Moreover, at no time prior to the filing of the opposition papers to the motion for summary judgment did Plaintiffs indicate that this new theory was to be pursued.")

## IV. *Universal's Purported Submarket* [10]

Even if this Court were to construe Universal's opposition papers as a motion to amend the Complaint and permit revision under a liberal reading of Rule 15 of the Federal Rules of Civil Procedure, Universal fares no better because it has not managed to create a genuine issue of material fact as to whether the asserted submarket even exists or is a proper relevant market.

■ Because it makes no economic sense to punish a manufacturer for asserting the "natural" monopoly in the sale and distribution of its own products, courts have historically declined to limit their antitrust analysis to a defendant's brand of products alone. *Metzler v. Bear Automotive Service Equipment Co.*, 19 F.Supp.2d 1345, 1354 (S.D.Fla.1998). However, in very limited circumstances it is possible for "switching costs," "information costs," and a "lock-in" to create a potential for aftermarket power in the derivative aftermarkets for the manufacturer's own equipment. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 477, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).[11]

issues outside of the pleadings "by express or implied consent," thus legitimizing an amendment under Fed.R.Civ.P. 15(b).

9. Universal is not able to establish improper conduct on the part of Collins in the general aviation market. See *infra* n.7.

10. The record in this matter is massive. While the Court faults the attorneys on both sides, Universal must take more of the blame. In an effort to simplify and organize the record into a more workable condition, the Court ordered counsel for both sides to confer and submit a joint statement of undisputed and disputed material facts. Unfortunately, this resulted in the filing of yet another imposing document consisting of 277 pages. Few facts were really agreed upon. Universal refused to admit even routine introductory facts and went as far as to deny facts it had previously alleged in earlier pleadings. Wherever possible, the Court will refer and cite to this joint statement as "JSF [paragraph number] at [page number]." When the parties could not agree whether a fact was or was not disputed, they recited their respective position. When the Court refers to any of these facts as "undisputed," it means that the Court has reviewed both parties' positions and determined that the fact is in reality an *undisputed* fact.

11. When Kodak first sold its photocopiers, it relied on purchasers to obtain service from independent service providers. Later, Kodak used its market power in unique replacement

■ "Switching costs" are costs borne by customers who have already purchased a product and who would incur an additional cost if they switched to another product. *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir.1997). If the cost of switching is high, consumers who have already purchased a product are "locked in" and will tolerate price increases to avoid purchasing additional products. *Metzler*, 19 F.Supp.2d at 1356. "Information costs" are costs that prevent consumers from obtaining all relevant information about a product at the time of sale. *PSI Repair Services*, 104 F.3d at 818. If information costs are high, customers are not made aware of the risk of potential exploitation or "hold-up" at the time of purchase. *Kodak*, 504 U.S. at 473–75, 112 S.Ct. 2072. Where such market power exists, the relevant product market could be limited to aftermarket to be used only with the primary products sold by that supplier. X Areeda, et al., Antitrust Law ¶ 1740, at 169 (1996).

■ The following four factors must *all* be satisfied in order to conclude that a *Kodak* lock-in market exists:

1. High "switching costs": A substantial number of customers must have made brand-specific investments that still have a useful life but that are substantially unrecoverable if they shift to other brands;

2. High "information costs": A substantial number of those customers must be too ignorant of "lifecycle" prices to protect themselves by judicious interbrand comparisons or by contract before they become locked in;

3. Ability to exploit ignorant customers: The knowledgeable customers who can protect themselves must either be unimportant to the defendant or be protected by effective price discrimination from above market prices paid by the ignorant; and

4. Ability to exploit must be "substantial": The defendant's resulting ability to exploit the ignorant must be "substantial."

*Kodak*, 504 U.S. at 467–473, 112 S.Ct. 2072; X Areeda ¶ 1740, at 138.

■ A plaintiff faces a *substantial* burden to overcome the presumption under the antitrust laws that "normal" market forces are at work. He "must offer enough evidence to allow a reasonable jury to conclude that each element of a substantial lock-in claim … is more likely than not to be present. Unless each condition necessary for power is shown by a prepon-

parts to squeeze the independent service providers out of the repair market and force purchasers to obtain higher priced service from Kodak. Because the change in policy was not foreseen at the time of sale, purchasers had no way of calculating the higher service cost into their purchasing decision. Thus, *Kodak* involved three independent products: the Kodak copiers (the "lock-in" product), the Kodak copier replacement parts (the "tying" product), and the Kodak copier servicing and repair (the "tied" product). The Court in *Kodak* was asked to determine whether parts and services could be distinct products for antitrust purposes and whether a defendant's lack of market power in the pri-

mary equipment market precluded as a matter of law the potential for market power in derivative aftermarkets. Since Kodak's servicing competitors had produced evidence of high switching costs for Kodak copier owners, the *Kodak* Court concluded that such "lock-ins" could help the competitors establish Kodak's appreciable economic power in the derivative "tying" aftermarket for Kodak parts. The Court in *Kodak* accordingly held that the undetermined "information costs" and "switching costs" presented material issues of fact, and if genuinely disputed, would preclude summary judgment, even though Kodak lacked appreciable economic power in the "lock-in" product market for copiers.

derance of the evidence, summary judgment or a directed verdict for the defendant is appropriate for the defendant who lacks sufficient power in the primary market." X Areeda ¶ 1740, at 168.

Collins does not rely on element one in support of its Lock–In Motion. Instead, it argues that Universal cannot demonstrate by a preponderance of the evidence Areeda elements two through four. The Court agrees but will begin and end its analysis with Areeda element two, high "information costs."

█ In assessing the issue of information deficits between the foremarket and the aftermarket, perfect information about the aftermarket is not required. *SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 19, n. 3 (1st Cir.1999), *cert. denied*, 528 U.S. 1188, 120 S.Ct. 1241, 146 L.Ed.2d 100 (2000). In fact, "very imperfect knowledge suffices" to defeat the assertion of a *Kodak* lock-in market. X Areeda ¶ 1740, at 157. The issue is whether the primary market is in possession of information that sufficiently reveals the anti-competitive tendencies of a manufacturer in its aftermarket. *SMS*, 188 F.3d at 18, n. 3. "[T]o show that those who are locked in can be exploited, the plaintiff must prove that they are 'ignorant' in the sense that they could not reasonably anticipate later 'exploitation' . . . and that they could not reasonably protect themselves in the marketplace by obtaining, say, contract guarantees or warranties from the defendant or his rivals." X Areeda ¶ 1740, at 158.

A. *Universal cannot demonstrate that Collins customers were "ignorant" at the time they purchased Collins equipment.*

█ As an example of Collins' unlawful conduct, Universal alleges that during the vendor selection process for FCSs, Collins represented to Bombardier and Saab that FMS vendors would be given the necessary hardware and data in order to interface onto Collins Pro Line 4 System. (Complaint ¶ 16.)

Universal failed to prove that Collins breached any representations or was unwilling to cooperate with external FMS suppliers. (JSF ¶ 77 at 39.) In fact, Universal's own economics expert, Professor Smith, admitted that in all cases where Collins represented that a shipset would be "open architecture," the OEMs that decided to add a non-Collins FMS, had been able to do so. (*Id.*) Moreover, Professor Smith did *not* conclude that the OEMs were unaware of the risk of hold-up at the time they selected a Collins avionics shipset. (JSF ¶ 43 at 31–32; ¶ 75 at 38.) Finally, Professor Smith admitted that the customers had the information they needed in order to adequately assess the risk of purchasing Collins equipment, at least with respect to adding external FMSs later. (JSF ¶ 75 at 38.)

With respect to the make-up and knowledge of Collins customers, the undisputed evidence suggests the following:

▶ Most of the general aviation airframe OEMs are large companies that are generally sophisticated about the conduct of their business. (JSF ¶ 79 at 39.);

▶ OEMs that are successful in selling aircraft are generally competent about the features and functions their end-users will want to look for in an aircraft. (JSF ¶ 74 at 37.);

▶ OEMs are making purchasing decisions about very expensive products. For example, Collins sold its Pro Line 4 shipset to Bombardier for the Canadair Regional Jet ("RJ") for an initial price of over $400,000 and Bombardier had already purchased or committed to

purchase over 480 of these units. (Collins' Lock–In Motion at 14, n.13; JSF ¶ 78 at 13; ¶ 133 at 65.);

▶OEMs are repeat purchasers of avionics for their new aircraft models and are able to use their relationship with their suppliers and the suppliers' interest in future business from the OEM to obtain concessions on existing aircraft programs. (JSF ¶ 83 at 43.) For example, Bombardier's Director of Procurement testified that Collins could not and would not attempt to prevent Bombardier from purchasing FMSs from another supplier because "it's in nobody's interest to resist a customer's will or [Bombardier's] will because he is going to be excluded from any other program." (JSF ¶ 84 at 45.) If a supplier did refuse to cooperate with Bombardier, "it would be the end of that company with [Bombardier]." (*Id.*) Additionally, the President of Bombardier's Business Aircraft Division testified that Collins does not have the power to force its products on Bombardier if it wants to stay in business and continue to be awarded future contracts for Bombardier aircraft programs. (JSF ¶ 86 at 48.);

▶OEMs know that it is costly to switch FMS suppliers in the middle of an aircraft program, that it may be expensive to install a different FMS later, and that it would require some cooperation from their FCS supplier should they elect to do so. (JSF ¶ 81 at 42.); and

▶ OEMs are aware of the risk of hold-up and are aware that they can become locked-in to their avionics supplier. (JSF ¶ 82 at 43.)

Under these circumstances, Universal cannot demonstrate that Collins customers were ignorant to the point of not being able to reasonably anticipate later exploitation. A supplier is unlikely to exercise market power where, as here, it faces a limited number of sophisticated customers on whom it depends for repeat business, particularly in a close-knit industry in which information flows easily. (JSF ¶ 79 at 39.) In fact, under these circumstances, a "hold-up" is *least* likely to occur. (*Id.*) Given that "[i]t suffices that most buyers know the risks of dealing initially with the defendant rather than with his rivals" (X Areeda ¶ 1740, at 157), Universal cannot prove that Collins customers were "ignorant" at the time they made their purchasing decisions.

Case law adequately supports this finding. *See Kodak,* 504 U.S. at 484, 112 S.Ct. 2072 ("Thus, Kodak simultaneously claims that its customers are sophisticated enough to make complex and subtle lifecycle-pricing decisions, and yet too obtuse to distinguish which breakdowns are due to bad equipment and which are due to bad service. Kodak has failed to offer any reason why informational sophistication should be present in one circumstance and absent in the other."); *SMS,* 188 F.3d at 23 ("Sophisticated consumers with [a preference for a specific product] will know beforehand that they will lock themselves in by their choice of manufacturer and do so willingly."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 440 (3rd Cir.1997) ("The franchise transaction between Domino's Pizza, Inc. and plaintiffs was subjected to competition at the precontract stage. That cannot be said of the conduct challenged in *Kodak* because it was not authorized by contract terms disclosed at the time of the original transaction."); *PSI Repair Serv., Inc.,* 104 F.3d at 820 ("In this case, there are no allegations that Honeywell changed its parts-restric-

tive policy in order to lock-in customers, nor has PSI alleged that Honeywell's policy was not generally known. There also is evidence that Honeywell and its customers engage in lengthy negotiations before the sale. of Honeywell equipment."); *Metzler*, 19 F.Supp.2d at 1352 ("Furthermore, by 1989, a substantial majority of Bear and Allen customers had previously purchased machines from either the defendants or a competitor and were presumably knowledgeable about the market for automotive diagnostic machines and the practices of various manufacturers with regard to their service and parts policies.").

B. *Collins Customers reasonably protect themselves from the risks of purchasing Collins equipment.*

■■■ The record plainly establishes that Collins customers can and do protect themselves contractually before they become "locked-in":

▶ If Bombardier wants to add other suppliers' avionics, its contract gives it the ability to force Collins "to proceed with any technical requirement" and "discuss the commercial aspect" later. (JSF ¶ 106 at 57.);

▶ If Collins' contract with Lear was amended to provide for the installation and sale of a Universal FMS option on the Lear 60. (JSF ¶ 110 at 58; ¶ 113 at 16.);

▶ The Canadair Equipment Specification for the RJ program provides only that it is "desirable" although not "mandatory" that the Collins avionics shipset be capable of interfacing with Universal and Honeywell external FMSs. (JSF ¶ 128 at 62.);

▶ Bombardier–Collins contract for the RJ, which set the price for the Collins shipset including the optional FMS, allows Bombardier "at any time" (with price adjustments as negotiated) to change the general scope of the contract, including design and specification changes. (JSF ¶ 130 at 64; ¶ 132 at 17.);

▶ Collins licensed its data dictionary to Bombardier for a $63,500 license fee and the two companies negotiated an agreement allowing Collins to assist in developing the FMS interface for a cost of $650,000. (JSF ¶ 136 at 65–66.);

▶ The CL–604 contract between Collins and Canadair requires Collins to "integrate on the Aircraft and interface with other Canadair suppliers" additional, identified avionics equipment, including an FMS. (JSF ¶ 163 at 18.);

▶ Collins and Raytheon have an agreement for Collins to supply a Pro Line 21 shipset for the Premier aircraft, including a single Collins FMS 3000. The contract makes the Pro Line 21 and the FMS 3000 part of the "Standard Avionics package" for the Premier. (JSF ¶ 189 at 20.);

▶ Saab and Collins have agreed that Saab retains the right to sell non-Collins equipment, including another manufacturer's FMS. Under the contract, the FMS is a "standard option" and if a customer wants to install a different manufacturers' equipment, Saab will provide Collins the opportunity to negotiate directly with the prospective customer in order to sell its FMS. (JSF ¶ 187 at 91.); and

▶ Saab has delivered and sold two Saab 2000 aircraft on which Honeywell FMSs, not Collins FMS, have been installed. (JSF ¶ 200 at 20.) To accomplish the interface, Collins licensed its FMS specification and data dictionary to Saab for a $50,000 licensing fee. The agreement also provided that Saab would pay Collins for its engineering services to develop the external FMS interface. (JSF 201 at 21.)

The undisputed facts point to savvy customers that can and do protect themselves contractually *before* they get locked-in to Collins products. When Collins customers have to add an external FMS *post-contractually*, they can and do negotiate the terms of their contract to meet their preferences. Universal simply cannot demonstrate that knowledgeable customers are unable to "reasonably protect themselves in the marketplace by obtaining, say, contract guarantees or warranties" (X Areeda ¶ 1740, at 158) from Collins.

Universal failed to create an issue of fact as to whether a substantial number of Collins customers were too ignorant to protect themselves when they purchased Collins FCSs. Unable to satisfy the four-part *Kodak* test, Universal is not entitled to a trial on its lock-in theory.

■■■■ Universal cannot satisfy Areeda element two for the additional reason that Collins customers contracted to purchase their FCSs and FMSs simultaneously. When the tied and tying products are purchased at the same time, the defendant's power must obviously be assessed at the outset, when no relevant power has been assessed. X Areeda ¶ 1740, at 146. For example, in a franchise situation where the defendant conditions a trademark license on the fanchisee's simultaneous agreement to buy a building to conduct the business, the defendant's power to induce this tie is unaffected by any subsequent lock. *Id.* This is because the tied product purchase is a one-time transaction at a price fully known when the tying trademark is initially licensed and the franchisee can easily compare the price of the defendant's above market terms. *Id.*, n. 19. *See also Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 783 (5th Cir.1999) (where the court agreed with the district court's determination that DGI's characterization of the expansion products market as the relevant market

was at odds with market realities in part because the record showed that the prices for two-thirds of all of the cards were set at the time a telephone company purchased a switch).

The record here discloses that Collins does not manufacture or sell an FMS to dealers or end-customers for retrofit installation onto any general aviation aircraft other than those that are equipped with a Pro Line 4 or Pro Line 21 shipset. (JSF ¶ 13 at 22; ¶ 43 at 109.) For example, a Collins Pro Line 4 or Pro Line 21 shipset has been installed or selected for 15 aircraft in production or development. (JSF ¶ 15 at 11.) Thirteen are new production aircraft and two are retrofit or replacement of older avionics on two existing aircraft models with Pro Line 4 systems. (*Id.*) In fact, Bombardier favors purchasing a completely integrated avionic suite from a single supplier for installation on its aircraft and when developing a new aircraft program, will typically select a single supplier to be responsible for providing and integrating all of the avionics functionality required. (JSF ¶ 65 at 34.)

Given the record in this case, it would be plainly contrary to the "economic reality of the market at issue" *(Kodak,* 504 U.S. at 467, 112 S.Ct. 2072) to assume that Collins customers did not know what they were doing when they agreed to purchase Collins equipment. Because Universal did not present legally sufficient evidence that Collins customers faced significant information costs, and because Universal's proffered relevant market does not comport with market realities, its aftermarket antitrust claims fail as a matter of law.

Accordingly,

IT IS ORDERED as follows:

1. Collins' Motion for Partial Summary Judgment and for Other Relief Relating to Plaintiff's Asserted "Lock-in" Submarkets (Document 360) is GRANTED;

2. There being no just reason for delay, judgment pursuant to Fed.R.Civ.P. 54(b) shall be entered in favor of Collins on Counts One and Two;

3. Collins' Motion for Partial Summary Judgment on Plaintiff's Tying and Exclusive Dealing Claims (Document 357) is DENIED AS MOOT;

4. Collins' Motion for Partial Summary Judgment on Plaintiff's Attempted Monopolization Claim (Document 358) is DENIED AS MOOT;

5. Universal's Motion for Summary Judgment (Document 352) is DENIED AS MOOT; and

6. Collins' Motion for Partial Summary Judgment on Plaintiff's Common Law Claims of Tortious Interference and Unfair Competition (Document 359) and Collins' Motion for Partial Summary Judgment on Defendants' Counterclaim for Defamation Per Se (Document 361) are STAYED pending resolution of any appeal of the federal antitrust claims.