**Robert METZLER and Allstates of America, Inc., Plaintiffs,**

v.

**BEAR AUTOMOTIVE SERVICE EQUIPMENT COMPANY, SPX Corporation, the Allen Group, and Roland Gerber, Defendants.**

No. 93–1993–CIV.

United States District Court,
S.D. Florida.

Sept. 4, 1998.

Blaine Winship, & Karen M. Byrne, Miami, FL, for Robert Metzler and Allstates of America, Inc.

Ronald Ravikoff, Christopher Carver, Ross Bricker, John Ward, Eric A. Sacks, and Terrance Truax, for Bear Automotive Service Equipment Co.

## AMENDED ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS 3 THROUGH 13

GOLD, District Judge.

The issue before the Court on defendants' motion for summary judgment is whether, under the principles set forth in *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), the defendants' alleged refusal to sell certain internal parts for their automotive diagnostic equipment without repair service can constitute illegal tying or monopoly in violation of sections 1 and 2 of the Sherman Act where the defendants never changed their parts and service policy and there is no showing that the defendants concealed the true cost of repairs or charged unreasonably high prices for internal parts or service.

### I. FACTS

Robert Metzler and his corporation, Allstate's of America, Inc., filed this lawsuit against Metzler's former employers, SPX and Bear Automotive Service, and the Allen Group, alleging claims for breach of contract, intentional infliction of emotional distress, interference with an existing and prospective business relationship, and violations of federal and state anti-trust laws, specifically sections 1 and 2 of the Sherman Act and sections 542.18 and 542.19 of the Florida Statutes.[1] The gravamen of the plaintiffs' antitrust claims is that the defendants have failed to make certain internal parts available to independent service providers who wish to service the defendants' machines. Defendants' actions are allegedly designed to force equipment owners to obtain their service from the defendants (the illegal tie) and to capture the service market in the defendants' machines (the monopolization and attempted monopolization). Both parties agree that the outcome of this case is controlled by principles of antitrust law set forth by the Supreme Court in *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

**The plaintiffs.** Robert Metzler is the owner, president, and chief executive officer of Allstate's of America, Inc. Beginning in 1983, Metzler, through his company, worked as a sales representative, selling automotive diagnostic equipment for defendants Bear and SPX. As part of his job, Metzler trained customers in the use of the equipment, installed upgrades, and performed some warranty work on Bear machines. In 1993, SPX ended the business relationship over Metzler's objection.

**The defendants.** SPX Corporation manufactures and sells diagnostic equipment used to test and evaluate automobile functions such as engine performance, gas emissions, and wheel balance and alignment. SPX also sells replacement parts and labor services for its equipment. In 1988, SPX acquired Bear Automotive Service Equipment Company, a corporation that manufactured and distributed Bear brands of engine analyzers, emissions/gas analyzers, computerized wheel alignment machines, and computerized battery testers.[2] In June 1993, SPX acquired Allen Testproducts, a division of The Allen Group, Inc., a company that manufactured

---

1. Section 1 of the Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, of with foreign nations, is hereby declared to be illegal." 15 U.S.C. section 1. Section 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. section 2.

2. Bear no longer exists as a separate entity.

and sold Allen Testproducts brands of engine analyzers, emissions/gas analyzers, and machines that combine engine and gas analyzers and emissions. After its acquisitions, SPX sold automotive diagnostic machines under both the Bear and Allen Testproducts brand names. In 1993, SPX consolidated the operations and product lines of Bear and Allen Testproducts into its Automotive Diagnostics division. At the end of 1996, the Automotive Diagnostics division was consolidated into SPX's Aftermarket Tool and Equipment Group. At that time, SPX stopped manufacturing the Allen Testproducts line.

**Automobile diagnostic equipment.** Automobile diagnostic machines are used to analyze problems with vehicles. These machines are manufactured and sold around the world by such companies as Ford, Chrysler, General Motors, Sun Electric, ESP, John Beam, Snap–On, and the defendants. It is undisputed that the market for automobile diagnostic equipment is highly competitive and swiftly changing. Automotive diagnostic machines are found in a wide range of automobile repair facilities, including independent service stations, car dealerships, and national automobile repair companies such as Pep Boys, Firestone, BP Oil, and Goodyear. Until the early 1980's, automotive diagnostic machines performed relatively simple diagnostic functions. But during the 1980's, as vehicles became more computer-based, manufacturers began selling computerized diagnostic equipment. In the early 1990's, Bear and Allen introduced personal-computer (PC) based automotive diagnostic equipment. The automotive diagnostic machines at issue in this lawsuit are large, PC-based machines set on wheeled carts. Outfitted with specialized software to provide an array of diagnostic functions, the machines are known in the industry as "big boxes." These machines generally cost between $10,000 and $40,000.

**Parts.** Although the defendants manufacture and sell both internal and external parts for diagnostic equipment, the plaintiffs' tying and monopoly claims relate solely to the defendants' actions concerning the sale and service of internal parts for the diagnostic equipment. Counting both external and internal parts, throughout the years at issue in this lawsuit, the defendants' equipment has been comprised of thousands of different types of parts. Of those thousands of parts, the plaintiffs have identified 109 internal parts which they claim are the alleged tying parts. In other words, the defendants allegedly will not sell any of these 109 parts unless the customer also agrees to purchase service. The differences between the internal and external parts to the defendants' automotive diagnostic equipment are explained below.

**External parts.** External parts for the defendants' equipment are easily obtained from a variety of sources and are interchangeable with the external parts of other manufacturers. When an external part needs to be replaced, the customer can generally perform the repair himself, without the need for a service technician. External parts are gradually used up and discarded by the customer.

**Internal parts.** Internal parts include such items as circuit board assemblies, programmed e-proms, internal power supplies, and built-in monitors. Some internal parts, such as circuit boards, are unique to the brand of equipment for which they are designed and will not work in other brands of automotive diagnostic equipment. Some internal parts are not unique. For almost all internal parts, a service call is generally required for repair or replacement. Unlike external parts, used internal parts typically have some repairable or exchange, "core" value, so they are not thrown away. The defendants buy back the internal parts and repair them.

Parts for Bear or Allen Testproducts equipment fall into three categories: internally-manufactured parts, parts sold by outside manufacturers, and off-the-shelf generic computer parts. The majority of parts for Bear equipment are off-the-shelf generic parts. A small number of parts for Bear equipment are internally manufactured. Some parts for Bear equipment, such as membrane key pads and optical benches, are manufactured by outside manufacturers.

The plaintiffs' allegations of illegal tying and monopoly apply only to the defendants' practices with respect to internal parts. In

contrast to external parts which are readily available from the defendants or other numerous sources, the plaintiffs claim that internal parts are usually obtainable only from the defendants. The amended complaint alleges that the defendants will not sell internal parts to competing ISOs and have prohibited authorized ISOs from selling to competing ISOs. In support of this contention, the plaintiffs submitted the affidavits of several independent service providers, all former employees of the defendants, who testified that they tried to buy parts from the defendants who either refused to sell to them or made them pay retail price.[3]

The defendants contend that they sell to anyone and that most parts can be purchased from multiple sources. They state that anyone seeking internal parts can purchase them from the defendants by calling a toll-free 800 number. The defendants will provide customers with a parts price list that specifies the price for each part. Parts are shipped directly to the customer from centralized warehouse facilities. Defendants presented evidence that many of the alleged tying parts, such as built-in monitors, internal harnesses, cables, connectors, optical benches, keyboards, some internal power supplies and some circuit boards are also obtainable from outside manufacturers to whom the plaintiffs have access equal to the defendants.[4] Defendants admit, however, that internal parts manufactured by Memtron are not readily available on the open market. In accordance with Memtron's standard practices, Memtron will not sell parts manufactured specifically for SPX without SPX's approval. SPX is only one of approximately 500 Memtron customers. Memtron's refusal to sell to third parties applies equally to all Memtron's customers. Its stated reason for this policy is that customers pay tool and die costs for manufacturing the part and are therefore entitled to determine to whom it is sold. Memtron will make the exact same item for any customer willing to pay the tool and die costs. It will also manufacture a part provided by a customer for duplication if the customer pays the engineering costs.

**Sales and Service.** Up to the early 1980's, the dominant player in the automotive diagnostic equipment business was Sun Electric. Sun used its own employees to sell and service its products. In contrast, authorized independent service organizations (ISOs), located throughout the United States and Canada, serviced products sold by Bear and Allen Testproducts. The authorized ISOs were able to purchase parts and upgrades from Bear or Allen Testproducts at substantial discounts. But in the early 1980's, Bear and Allen Testproducts followed Sun's example and began to replace independent sales and service organizations with their own employees. By 1990, Bear and Allen had replaced substantially all of their ISOs with their own employees. Presently, only three authorized ISOs remain in existence. Bear and Allen Testproducts' stated reasons for changing to in-house sales and service was that increased computerization made the machines more complicated to service. The defendants, therefore, trained in-house technicians to ensure that repairs would be properly and promptly made.

Significantly, the defendants' policies and practices with regard to the sale of replacement parts and the provision of service have remained essentially unchanged since the mid–1980's. Allen Testproducts' policies and practices for the sale of replacement parts and the provision of service have generally been identical to Bear's, with one exception. Until 1993, Allen Testproducts would not sell internal circuit boards to anyone without accompanying professional Allen Testproducts installation. But in 1993, when SPX bought Allen Testproducts, it changed the Allen Testproducts circuit board policy so it comported with Bear practices. Customers needing repairs for most Bear or Allen Testproducts equipment had three choices: (1) they could obtain service directly from the defendants' technicians; (2) they could perform the service themselves, or (3) they could

---

3. Agosto affid. at paragraph 4, Martin affid. at paragraph 3, 6, Berry affid. at paragraph 3, Baker affid. at paragraph 5.

4. Bailey affid. at paragraphs 26, 28, 34, Munelly affid. at paragraphs 24, 26, 34, Kepple affid. at paragraph 4.

hire an ISO or other technician to perform the repairs.

Repair service was, and is, provided by the defendants either through service contracts or on a time and materials basis. The service contract is the equivalent of an extended warranty which obligates the defendants, for a predetermined price, to repair any problems arising during the contract period. Repairs performed on a time and material basis require the customer to pay for the repair on an hourly basis and to pay for any part needed in the repair.

The plaintiffs allege that the defendants illegally tie the sale of certain internal parts to the purchase of defendants' repair services. To support this contention, the plaintiffs submitted the affidavits of two former Bear employees, now independent service providers, who testified that they were instructed to tell customers that no one else could perform service but the defendants. Also submitted was the deposition of an independent service provider who stated that when he tried to order internal circuit boards from Bear, Allen, or SPX, he was told to contact the service department because circuit boards must be installed by SPX technicians.[5]

**Warranty Coverage.** SPX equipment is generally sold with a standard one-year factory warranty covering parts and labor from SPX during that period. An extended warranty or service contract is available, but not mandatory, for customers who want additional coverage.

Defendants also sell parts with warranty coverage. Warranty coverage on parts is optional with the customers. The plaintiff submitted the deposition of a former Allen employee who testified that for certain internal parts that defendants consider physically sensitive, such as circuit boards, no warranty is provided unless one of the defendants' technicians performs the installation. For purposes of summary judgment, each defendant concedes that it did not warrant internal parts sold without service.

**Prices.** Prior to 1983, the defendants gave large national accounts and ISOs a substantial discount on part prices. After the switch to in-house technicians, all customers, except large national accounts, paid list price for parts. Metzler and Allstate's claim that by refusing to give ISOs a discount on parts, the defendants have engaged in anticompetitive practices because without the discounts, it is difficult for the ISOs to compete with the defendants in the service market. Plaintiffs further contend that once the defendants switched from ISOs to in-house technicians, they began charging supracompetitive prices for parts and service.[6] Nonetheless, a careful review of the record shows that the plaintiffs submitted absolutely no credible evidence in support of a finding of supracompetitive prices.[7] To the contrary, the undisputed evidence shows that plaintiffs' service rates were comparable to the rates charged by the defendants. Bear and SPX's rate for service remained at $85 per hour from 1989 until 1997, when SPX raised its rate to $90 per hour.[8] The plaintiffs' hourly charge for service was $75 an hour from 1989 to 1993. In 1994 it rose to $80 an hour, and in 1995, it equaled SPX's rate of $85 an hour. The record contains no evidence regarding the prices charged for service by any other ISO, past or present.

---

**5.** Agosto affid. at paragraph 3, Martin affid. at paragraph 3, Namon deposition.

**6.** A price is supracompetitive if it is substantially higher than the defendants would charge in a competitive market. See Phillip E. Areeda, Herbert Hovenkamp, and John L. Solow, *Antitrust Law* ¶¶ 501–03 (1995).

**7.** Some former employees of the defendant, now independent service providers, testified for the plaintiffs that the defendants charged high prices. Their testimony about high prices, however, was very general. They didn't explain the

basis for their conclusion that the prices were high. They made no comparisons to the prices charged by the defendants' competitors. See e.g., Perry depo. at 258

Q. Do you have any knowledge as to whether any of these companies, these authorized ISOs, ever indicated to you that their customers were unhappy with the prices that these parts from Bear and Allen were being set at?
A. Oh, yeah, sure. Everybody complains about prices....Sometimes it is not justified but they complain anyhow.

**8.** The defendants also add a mileage charge.

As for parts prices, the plaintiffs have failed to submit a complete list identifying the prices charged by the defendants for the 109 alleged tying parts. Nor did they submit evidence as to the prices charged by defendants' competitors for comparable internal parts. Likewise there is no evidence that the package price for defendants' equipment, parts, and service was, at any time, higher than the package price of equipment, parts, and service sold by any competing manufacturer.

**Customer information.** Metzler and Allstate's contend that defendants failed to inform potential customers about the lifecycle costs of Bear and Allen equipment, thereby creating a "de facto" lock-in because once the customers purchased the expensive diagnostic equipment, it was not economically feasible for them to switch to other brands of equipment. Nothing in the record, however, supports a finding of a "de facto" lock-in. The plaintiffs' own evidence shows that it is difficult for equipment owners to estimate the total expected costs for automotive diagnostic equipment, whether the brand is Bear, Allen, Sun, or any other brand. Useful life varies depending on a number of factors including frequency of use, weather, and accidents in the shop.[9] In discovery Metzler acknowledge that the defendants' policies with respect to parts and services has been well known since the early 1989's.[10] Furthermore, by 1989, a substantial majority of Bear and Allen customers had previously purchased machines from either the defendants or a competitor and were presumably knowledgeable about the market for automotive diagnostic machines and the practices of various manufacturers with regard to their service and parts policies. Contrary to plaintiffs' contentions, the evidence of record shows that the defendants' policies and practices with respect to parts and services was generally known.[11]

9. See affidavit of independent automobile repair service owner, Andrews at 8.

10. See plaintiffs' sworn interrogatory answers.

11. E.g., Berry affid. at paragraph 7, Martin affid. at paragraph 3, Vega affid. at paragraph 3.

## II. PROCEDURAL HISTORY

Plaintiffs' Second Amended Complaint for Damages and Injunctive Relief alleges the following claims: Count I is a state-law claim for breach of contract against Bear and SPX; Count II alleges a state-law claim for Intentional Infliction of Emotional Distress against Bear and SPX, Counts III and VII allege federal antitrust claims of unlawful tying; Counts V and VI allege federal antitrust violations of monopolization and attempted monopolization; Counts VII, VIII, IX, and X allege state antitrust violations for unlawful tying and monopolization; Counts XI, XII, and XIII allege state law claims for intentional interference with an existing and prospective business relationship; and Count XIV alleges a state law claim for wrongful termination of contract against Bear and SPX.

The parties have engaged in extensive discovery in this vigorously-litigated case which is now in its fifth year.[12] Counts I (breach of contract) and XIV (wrongful termination) are no longer viable because a predecessor judge granted summary judgment in favor of defendants, approving a Report and Recommendation of the magistrate. The plaintiffs had alleged that Bear and SPX breached an oral employment contract granting the plaintiffs the right to be exclusive distributors of the defendants' products in a specific sales territory in Dade County. Summary judgment was granted on the basis that the claim was barred by the statute of frauds and that the relationship was terminable at will. Count II for intentional infliction of emotional distress was dismissed.

Count XIII alleges a state-law claim against SPX for Intentional Interference with Existing and Prospective Business Relations. The gravamen of Count XIII is that SPX intentionally interfered with a business relationship the plaintiffs had with Hennessy by telling a Hennessy representative that

12. The statute of limitations in an antitrust action is four years. 15 U.S.C. section 5b. Consequently, the relevant period for plaintiffs' antitrust claims commences on October 13, 1989, four years prior to the filing of the initial complaint.

SPX was involved in litigation with the plaintiffs. The magistrate recommended that SPX's motion for summary judgment on the intentional interference claim be granted, finding that as a matter of law the plaintiffs have no basis in prevailing on the third element of the claim—an intentional and unjustified interference. This Court issued an order which concluded that the magistrate judge had erred when he relied on a state-law prohibition against pyramiding inference on inference when federal law was to the contrary. Consequently, Count XIII is viable at this time. Defendants, however, have filed a renewed motion for summary judgment or, in the alternative, motion in limine, to exclude evidence as to Count XIII.

The plaintiffs filed a motion for partial summary judgment on relevant market and monopoly, arguing that the undisputed facts show that there is no competitive aftermarket for parts and service of internal parts. On January 26, 1998, the Magistrate Judge recommended that this motion for summary judgment be denied because there is evidence showing that the defendants do not control the market of available parts, including Metzler's own affidavit, which states that he has been successful in obtaining parts. Plaintiffs filed objections to the Report and Recommendation. On March 23, 1998, this Court affirmed the magistrate's report and denied summary judgment in favor of the plaintiffs on the relevant market, monopoly power, and related issues.

The motion presently before the Court is defendants' motion for summary judgment on Counts III through XII, the antitrust counts. Defendants argue that they are entitled to summary judgment because the plaintiffs cannot demonstrate the requisite elements of an illegal tie, nor can they show monopolization or attempted monopolization. On June 15, 1998, the magistrate judge issued a Report and Recommendation that defendants' motion for summary judgment be denied. The defendants filed objections.

## III. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

■ It is axiomatic that when an objection is made to a magistrate's findings or recommendations on a dispositive motion, the district court shall make a *de novo* determination of those portions of the report or proposed findings to which the objections are addressed. *United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980). The report and recommendation issued in this case recommended that summary judgment be denied, stating, "regardless of whether a change in policy is or is not required under *Kodak,* there are issues of fact … which remain to be resolved at trial." After conducting a *de novo* review of the record, this Court disagrees. In accordance with the holdings of the First, Third, Sixth, and Seventh Circuits, as well as numerous federal courts and commentators, this Court finds that an antitrust plaintiff cannot succeed on a *Kodak*-type theory where the defendant has not, within the applicable statute of limitations period, exacted supracompetitive prices by implementing a restrictive anticompetitive change of policy that locked in customers, or used other coercive anticompetitive methods to deceive customers about the prices they would have to pay for parts and service. On this record, there is no evidence of a restrictive policy change, coercive methods to prevent customers from learning the lifecycle costs of defendants' equipment, or the imposition of supracompetitive prices. Accordingly, defendants' objections to the magistrate's report and recommendation are well taken, as explained in detail in the sections to follow.

## IV. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods,*

*Inc.,* 121 F.3d 642, 646 (11th Cir. September 10, 1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.,* 121 F.3d at 646.

In considering the motion, the Court must construe the evidence and the inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Furthermore, facts asserted by the party opposing a summary judgment must be regarded as true if supported by affidavit rendered an opinion or other evidentiary material. *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir. 1981). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Tyson Foods, Inc.,* 121 F.3d at 646; *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. Applying this standard, in order to avoid summary judgment, the plaintiffs are required to come forward with sufficient evidence in support of each element of their tying and monopoly claims for a jury to return a verdict in their favor. *Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc.,* 138 F.3d 869, 873–74 (11th Cir.1998).

### V. APPLICABLE LAW

Metzler and Allstate's do not contend that the defendants' practices in selling replacement parts or providing repair services for their automotive diagnostic equipment enabled the defendants to secure a monopoly, or attempt a monopolization, over the numerous other competing brands of automotive diagnostic equipment. Rather, the plaintiffs ground their claims on the holding of the Supreme Court in *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), that in some limited circumstances it is possible for "information costs," "switching costs," and a "lock-in" to create a potential for aftermarket power in the derivative aftermarkets for the manufacturer's own equipment.

**A. Market Definition.** Congress passed the antitrust laws to promote competition and to prevent monopoly. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 100 at 3 (1997). Under those laws, the existence of "competition" is determined by market performance, not the number of competitors. *Id.* at 3–4. Thus, while the antitrust laws protect competition, they do not protect competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

■ In seeking to encourage competition, the primary focus of antitrust laws is the promotion of competition between competing brands, or interbrand competition. *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 724, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *Continental T.V. Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). So long as there is sufficient interbrand competition, a firm's intrabrand policies will not be deemed a threat to competition. *See GTE Sylvania, Inc.,* 433 U.S. at 54–56, 97 S.Ct. 2549. Indeed, where there is interbrand competition, an intrabrand restraint may promote interbrand competition, rather than harm it. *See Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 810 (6th Cir.1988).

### 1. The Rule Against Single Brand Relevant Markets.

■ Given the antitrust laws' concern with interbrand competition, rather than intrabrand competition, courts have historically declined to limit their antitrust analysis to the defendant's brand of products alone. The rationale for this position is that under classic economic theory, cross-elasticity of demand in the basic equipment market prevents exploitation of the parts and service aftermarkets by consumers choosing not to buy the basic equipment. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). High prices for the defendant's brand can therefore be only a short-run phenomenon, which is simply not the type of problem with which antitrust laws are concerned. *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 234–36 (7th Cir.1988) (Posner, J.,

dissenting). As the Supreme Court stated in *E.I. du Pont de Nemours & Co.*, it simply makes no economic sense to punish a manufacturer for asserting the "natural" monopoly in the sale and distribution of its own products. 351 U.S. at 393–95, 76 S.Ct. 994 (1956). *See also Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978).

Because it would be inappropriate to punish a firm for its natural monopoly in its own products, courts embraced a sweeping prohibition against analyzing alleged anticompetitive activity by focusing on single-brand relevant markets: "[A]bsent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir.1984); *accord Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479–81 (3rd Cir.1992); *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 797 (1st Cir.1988); *Mozart Co. v. Mercedes–Benz of North Am., Inc.*, 833 F.2d 1342, 1346–47 (9th Cir.1987); *A.I. Root Co. v. Computer/Dynamics, Inc.*, 806 F.2d 673, 675–76 (6th Cir.1986); *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 428–30 (D.C.Cir. 1986); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 673–74 (7th Cir.1985).

### 2. The Role of Market Imperfections.

Consistent with the rule against single-brand relevant markets, antitrust courts have declined to narrowly define a market based on market imperfections alone. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 25–26, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). For example, in *Jefferson Parish*, defendant East Jefferson hospital held a 30% market share in the New Orleans metropolitan area—not enough to prove market power. *Id.* at 7–8, 26–29, 104 S.Ct. 1551. Plaintiff, a doctor alleging illegal tying, tried to narrow the market by arguing that "market imperfections"—inadequate price information and reduced price competition due to insurance companies—effectively narrowed the market to one in which East Jefferson did have power. *Id.* The Supreme Court rejected that contention, holding that a relevant market may not be narrowed due to "market imperfections" alone. *Id.* The Court stated:

> While these factors [inadequate price information and insurance companies] may generate "market power" in some abstract sense, they do not generate the kind of market power that justifies condemnation of tying.

*Jefferson Parish*, 466 U.S. at 27.

### 3. The Kodak Case.

In June 1992, in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), the Supreme Court rendered an opinion on whether Kodak's restrictive policies in the sales of Kodak equipment parts constituted an illegal tying arrangement. In a 6–3 decision, the Court rejected Kodak's argument that it was entitled to summary judgment merely because it lacked market power in its alleged tying product market for photocopier and micrographic equipment. Based on a relevant market analysis, the majority held that Kodak was subject to suit when it suddenly implemented policies to control sales in the tied product market—the service aftermarket for Kodak equipment.

It was undisputed that Kodak faced a highly competitive interbrand market for copier and micrographic equipment. Beginning in the early 1980's, ISOs began repairing and servicing Kodak machines. Some ISO customers purchased replacement parts themselves, and others obtained both parts and service through the ISOs. In 1985 and 1986, Kodak switched to a policy of selling replacement parts only to customers who used Kodak's service or performed their own servicing. Kodak also obtained an agreement from the original equipment manufacturers that produced parts for its machine, not to sell Kodak parts to ISOs. Equipment owners and independent parts distributors were pressured not to sell Kodak parts to ISOs. A group of eighteen ISOs sued Kodak over the sudden change in parts policy, claiming that Kodak had unlawfully tied the sale of service for Kodak equipment to the sales of parts for Kodak equipment in violation of section 1 of the Sherman Act and had monopolized and attempted to monopolize the markets for the

sales and service for Kodak equipment in violation of section 2 of the Sherman Act.

Before plaintiffs had initiated any discovery, Kodak moved for summary judgment. Rather than engaging in a factual analysis of the relevant market, Kodak took an absolute theoretical position on market definition, arguing that the Court should adopt as a matter of law, the basic equipment market as its relevant tying product market. The defendant asked the court to adopt a per se rule that where there is competition in the market for the sale of a particular product, the manufacturer of the product cannot exercise market power in the parts or service aftermarkets for the product.

The district court granted Kodak's summary judgment motion. But the court of appeals reversed, holding that market imperfections can keep economic theories about how consumers behave from mirroring reality. 903 F.2d at 617. The court did not identify any specific market imperfections in the relevant markets, but it did indicate that some existing Kodak customers could be locked in to particular Kodak machines and therefore might be forced to pay supracompetitive prices for service rather than switch to new equipment. Id. at 616. In the Supreme Court, Kodak made the same arguments. Specifically, it argued that if it raised its parts or service prices above competitive levels, potential customers would simply stop buying Kodak equipment. Perhaps Kodak would be able to increase short term profits through such a strategy, but at a devastating cost to its long term interests. Thus, due to fierce competition in the interbrand equipment markets, Kodak cannot exercise market power or act anticompetitively in any derivative parts or service aftermarkets.

The Supreme Court flatly rejected Kodak's urging of a formalistic rule that did not take into account the facts of a particular case. Like the Court of Appeals, the Supreme Court focused on Kodak's change in its parts and service policy mid-stream, after customers had already purchased their machines and built businesses around existing Kodak policies. *Kodak*, 504 U.S. at 477 & n. 24, 112 S.Ct. 2072. If the cost of switching is high, consumers who already have purchased equipment are "locked in" and will therefore tolerate service price increases to avoid purchasing new equipment. The ISOs offered evidence showing that the initial outlay for Kodak equipment, combined with the required support, would make switching costs substantial. Under this scenario, a seller could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in service prices, and the number of locked-in customers was high relative to the number of new purchasers. The restrictive policy change, existing imperfections in the copier market such as high "information" costs and high "switching" costs, created an issue of fact as to whether Kodak had improperly locked in its customers, formed the basis to deny defendant's motion for summary judgment. *Id.* at 477 & n. 24, 112 S.Ct. 2072. Kodak's assertion that its policies resulted in a procompetitive market was clearly contrary to the facts. The Court stated that market definition is quintessentially a factual matter. 504 U.S. at 453, 112 S.Ct. 2072. Kodak's failure to show any factual support for its contentions was therefore critical to the denial of summary judgment.

4. **Post-*Kodak* Cases.** Cases interpreting *Kodak* have imposed a sharp limitation on its sweep. The dissent in *Kodak* advanced a proposition that an up-front tie-in of equipment and service would not raise the same antitrust concerns. 504 U.S. at 491–92, 112 S.Ct. 2072 (Scalia, J., dissenting). Circuit courts, discussing the holding of *Kodak*, have agreed, recognizing that the effect of an advance disclosure of a tying arrangement is to prevent the purchaser from being locked in.[13] For example, in *Digital Equip. Corp. v.*

---

**13.** Commentators have also discussed the importance of a mid-stream change in policy. See e.g., Daniel M. Wall, *Aftermarket Monopoly Five Years After Kodak*, 11 Antitrust 32 (Summer 1997); Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak*, 63 Antitrust L.J.

483 (1995); Michael W. Klass, Richard T. Rapp, *Litigating the Key Economic Issues After Kodak*, 7 Antitrust 14 (Spring 1993); Douglas S. Katz, *The Benefits and Burdens of Kodak from a Litigant's Perspective*, 7 Antitrust 8 (Winter 1992); Mark R. Patterson, *Coercion, Deception, and other De-*

*Uniq Digital Technologies, Inc.*, 73 F.3d 756 (7th Cir.1996), the Seventh Circuit characterized the triable issue in *Kodak* as "whether the change in policy enabled Kodak to exact supracompetitive prices from customers who had already purchased its machines." *Id.* at 763.

The Court did not doubt in Kodak that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices. The material dispute that called for a trial was whether the change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines.

*Id.* at 763.

The First Circuit has also focused on the change in policy, stating, in *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14 (1994), that "the timing of the 'lock-in' at issue in *Kodak* was central to the Supreme Court's decision."

Had previous customers known, at the time they bought their Kodak copiers, that Kodak would implement its restrictive parts-servicing policy, Kodak's "market power," i.e., its leverage to induce customers to purchase Kodak servicing, could only have been as significant as its [power] in the copier market, which was stipulated to be inconsequential or nonexistent.

23 F.3d at 19.

In *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir.1997), the Third Circuit noted that "the *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies." *Id.* at 440. "Because this change in policy was not foreseen as the time of the sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision." *Id.* The Third Circuit concluded that *Kodak* did not apply because the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement. Unlike *Kodak*, the transaction between plaintiff and defendant

was "subjected to competition at the pre-contract stage." *Id.* Similarly, the Fifth Circuit has held that where the defendant's restrictive policies are disclosed in advance, information and switching costs are "virtually nonexistent." *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233 (5th Cir.1996).

Perhaps the *post-Kodak* case most significant to the resolution of the issue before this Court, however, is *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997). As in *Kodak* and the instant case, *PSI* involved a durable goods aftermarket. An ISO filed a lawsuit against Honeywell, a manufacturer of industrial machinery, alleging that it had violated antitrust laws by refusing to sell certain parts necessary for repairing internal circuit boards without accompanying service. The restrictive policy at issue had been in existence for many years. Relying on the holding in *Kodak*, the ISO argued that the relevant markets were the aftermarkets for Honeywell's circuit boards and service. The Sixth Circuit disagreed, finding that the absence of a change in Honeywell's policy was fatal to the ISO's claim, despite the fact that the policy made it impossible for the ISO to compete with Honeywell in repairing circuit boards.

Information and switching costs were particularly high in *Kodak* because Kodak adopted its parts-restrictive policy after numerous customers had already purchased Kodak copiers, thus creating a "lock-in" effect.... [T]he change in policy in *Kodak* was the crucial factor in the Court's decision. By changing its policy after its customers were "locked in," Kodak took advantage of the fact that its customers lacked the information to anticipate this change.

104 F.3d at 818–20.

The *PSI* court stressed the continued viability of the Supreme Court's decision in *Jefferson Parish*, which found that illegal market power could not derive from market imperfections alone. There must be change in policy that is coupled with any existing market imperfections. 104 F.3d at 829("we

thus hold that an antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies.").

## VI. APPLICATION OF LAW TO FACTS OF THIS CASE

The defendants contend that under the principles set forth in *Kodak* and its progeny, Metzler and Allstate's simply cannot establish their case because they cannot show that the defendants changed their policies to become restrictive, thereby locking in their customers, or otherwise failed to be forthcoming about their pricing structure and service policies. Without a showing of a change in business policy, or other coercive practice which concealed the true cost of parts and repairs, the exception to the general rule—that the relevant market is the primary equipment market—cannot apply because the purchasers of the automotive diagnostic equipment knew about repair costs at the time they bought the equipment. Under these circumstances, the relevant market is the primary equipment market.

**THE RELEVANT MARKET.** Central to the outcome of the section 1 tying claim and the section 2 monopoly claims is the Court's determination as to the relevant product market. This determination is critical because if the market is defined as the primary equipment market, the plaintiffs cannot prevail because the uncontradicted evidence of record shows that the defendants clearly have no market power in the primary equipment market.

The plaintiffs argue that through the use of coercive practices, such as a refusal to sell parts to ISOs, the defendants have gained sufficient market power in the tying product market (parts) to restrain competition in the tied product market (service). Consequently, as in *Kodak*, a trier of fact could conclude

that competition in the equipment market does not really curb defendants' power in the parts and service aftermarket. Thus, according to the plaintiffs, the relevant market should be the aftermarket for parts and services.

In *Kodak*, the defendant sought summary judgment arguing that as a matter of law "equipment competition precludes any finding of monopoly power in derivative aftermarkets." 504 U.S. at 464, 112 S.Ct. at 2085. Rejecting Kodak's economic theory, the Court denied summary judgment because the ISOs had presented a reasonable theory that due to Kodak's change in policy, Kodak's argument was factually incorrect: owners of Kodak equipment were unable to calculate lifecycle costs at the time of purchase because the seller's change in policy was not foreseen and significant switching costs discouraged them from changing to other equipment once the true costs were known. 504 U.S. at 471, 112 S.Ct. at 2086. Because of these particular circumstances, ordinary market forces, which would have caused higher prices in the parts and service aftermarkets to be offset by lower profits in the primary equipment market as customers switched to lower-cost equipment, did not apply. The limited choices available to owners of Kodak equipment led the Court to conclude that under certain circumstances, one brand can form the relevant market for purposes of both section 1 and section 2 of the Sherman Act. *See Collins v. International Dairy Queen, Inc.,* 980 F.Supp. 1252, 1256–57 (M.D.Ga.1997).

The Court finds that no particular circumstances exist in this case which would sustain a finding that the relevant market is the parts and service aftermarket for defendants' brand of products, rather than the primary equipment market. First, the plaintiffs have not identified a change in policy that locked in the defendants' customers.[14] Even plaintiffs' expert admitted that there has been no change in policy.[15] Until recently, Metzler

---

**14.** The only change in policy show by the evidence was SPX's elimination of Allen's policy of making the sale of certain internal parts contingent on the purchase of service.

**15.** When asked about whether there had been a change in the defendants' policies with respect to the alleged tying products, Dr. Seaman responded, "In my reading of the record, there has not particularly been a change in the policy of the

and Allstate's have not advanced the argument that the transition in the early 1980's from ISOs to in-house technicians was the change that locked in equipment purchasers to supracompetitive prices.[16] Nor would such an argument be persuasive. It is undisputed that the defendants' switch from ISOs to in-house technicians was a vertical integration. The elimination of a distribution network by vertical integration generally does not run afoul of the antitrust laws. *See University Life Ins. Co. v. Unimarc, Ltd.,* 699 F.2d 846, 852 (7th Cir.1983)("vertical integration," performance within one company of two or more steps in chain of production and distribution, does not violate the Sherman Antitrust Act). *Kodak* has very little to say about vertical restraints. *See* Ronald S. Katz, *The Benefits and Burdens of Kodak from a Litigant's Perspective* 7 Antitrust 8, 12 (Winter 1992). Furthermore, the defendants' decision to vertically integrate was made in the early 1980's, many years outside the statute of limitations period in this case.

Here the defendants never initiated a sudden restrictive change in policy which caused their customers to be unwittingly locked in to the use the defendants' services. To the extent that there are limited service options available in the market, those limited options have been in place for more than fifteen years.

Second, the plaintiffs have failed to establish a material fact in support of their contention that the defendants engaged in coercive practices which concealed the true cost of parts and repairs. They have made no showing that the defendants applied coercive tactics to prevent customers from estimating lifecycle costs prior to their equipment purchase. To the contrary, the evidence, in substance, establishes that customers knew or could readily obtain information about the defendants' parts and service policies. Customers unhappy with those policies could purchase equipment from other manufacturers. And customers were free to purchase their external parts and some internal parts from sources other than the defendants. This is in contrast to Kodak, which apparently tied the sale of *all* its parts with service.

Third, the plaintiffs have failed to produce sufficient evidence to permit a reasonable jury to find that the defendants used a change in policy to exact supracompetitive prices from existing customers. Supracompetitive prices is the ultimate evil arising from the sudden change in policy that concerned the Supreme Court in *Kodak.* As noted in *PSI Repair Services,* "[i]f there were any evidence in the record that [the defendant] took advantage of its customers' imperfect information in order to reap supracompetitive profits in the aftermarkets for its equipment, we would not hesitate to allow a *Kodak*-type theory to be submitted to the jury. However, we can find nothing in the record or [plaintiff's] brief that alleges that [the defendant] engaged in such activities. In this situation a *Kodak*-type theory is not applicable." 104 F.3d at 820. Similarly, there is nothing in the record before this Court to support a finding that the defendants coerced their customers to pay supracompetitive prices for either parts or service. The plaintiffs have presented no evidence showing the defendants regularly charged higher prices for parts to Bear and Allen equipment than the prices charged by the defendants' competitors for similar parts. Moreover, the undisputed evidence shows that the defendants' service charges were consistent with the plaintiffs' own service charges. For the foregoing reasons, the Court finds that the circumstances of this case are readily distinguishable from *Kodak,* Accordingly, the primary market is the relevant market for sections 1 and 2 antitrust purposes.

**A. THE TYING CLAIMS.** The plaintiffs contend that Bear and Allen, and later SPX, have illegally tied the sale of certain internal parts to their equipment to their repair services. A tying arrangement is "an agreement by a party to sell one

---

companies involved, the defendants, regarding their policy towards these products."

**16.** Plaintiffs' expert, Bruce Seaman, testified that "antitrust claims made by the plaintiffs in this case in no way depend upon any particular challenge to this historical shift toward a vertically integrated service system by the defendants." (Seaman's Exp. Rep.App. Ex. 1 at paragraph 11).

product but only on the condition that the buyer also purchases a different (or tied) product." *Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 462, 112 S.Ct. 2072, 2097, 119 L.Ed.2d 265 (1992). Such arrangement can violate the Sherman Act's prohibition against agreements "in restraint of trade." 15 U.S.C. section 1. But not every refusal to sell two products separately can be said to restrain trade. *Jefferson Parish Hosp. Distr. v. Hyde,* 466 U.S. 2, 9, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2 (1984). Courts have long recognized that Congress intended to prohibit only unreasonable restraints. *Southern Card & Novelty, Inc. v. Lawson Mardon Label,* 138 F.3d 869, 874 (11th Cir. 1998). Most antitrust claims are therefore analyzed under a "rule of reason," according to which the finder of fact must decide whether the practice at issue imposes an unreasonable restraint on competition. *Id.* This determination requires a consideration of a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect. *Southern Card & Novelty, Inc.,* 138 F.3d at 874.

 Certain tying arrangements, however, pose a predictable and unacceptable risk of stifling competition and therefore are unreasonable per se. *Jefferson Parish Hosp. Distr.,* 466 U.S. at 9, 104 S.Ct. at 1556. In the Eleventh Circuit, the per se rule is applied reluctantly, and only when experience with a particular type of restraint enables the court to predict with confidence that the rule of reason will condemn it. *Southern Card & Novelty, Inc.,* 138 F.3d at 874.*Retina Assoc., P.A. v. Southern Baptist Hosp.,* 105 F.3d 1376, 1381 (11th Cir.1997). The plaintiffs allege illegal tying under both the per se rule and the rule of reason. But it is far from certain that the practices at issue in this case would fall into the per se category. The Court will therefore first review all relevant considerations to determine whether the rule of reason would condemn them. *See All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.,* 135 F.3d 740, 746 (11th Cir.1998)("a presumption exists that the circumstances of a case will be looked at in the light of the rule of reason standard and will

not be deemed per se unreasonable"). An illegal tying arrangement has five elements:

> 1) a "tying" product and a "tied" product; 2) evidence that the seller forced the buyer to purchase the tied product to get the tying product; 3) that the seller has sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and 4) anticompetitive effects in the tied market; and 5) the involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product.

*Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1502–1503 (11th Cir.1985). A claim that a tying arrangement is illegal per se eliminates the requirement that the plaintiff show an actual anti-competitive effect. *Id.* The defendants contend that the plaintiffs have failed to carry their burden to come forward with sufficient evidence to create a genuine dispute of material fact in support of the second, third, and fourth elements of their illegal tying claim.

**1. Separate Products.** Two separate products are tied together if a difference exists in the "character and demand for the two items." *Id.* Thus to determine whether there are the parts and service are two separate products, the Court must focus on the demand for the two items. *Jefferson Parish,* 466 U.S. at 19, 104 S.Ct. at 1561–62. In *Kodak,* the Court wrote that parts and service can be separate products if there is "sufficient consumer demand so that it is efficient for a firm to provide service separately from parts." 504 U.S. at 462, 112 S.Ct. at 2080. For the purposes of this summary judgment motion, the defendants concede that parts and service are separate products.

**2. Evidence of actual coercion.** The plaintiffs cannot satisfy the second element of the test because the evidence shows that (1) there was no change in policy which locked in existing customers; and (2) there is no evidence showing that defendants exacted supracompetitive prices from customers who had already purchased their equipment. In *Kodak,* the defendant changed its business policy after customers had pur-

chased their equipment, thereby creating the opportunity to exact additional money from locked-in-customers by raising prices to noncompetitive levels. These factors, which were critical to the holding in *Kodak*, are simply absent in this case. Metzler and Allstate claim that the defendants refuse to sell parts to ISOs, or to sell them parts at a discount. Assuming for the purposes of summary judgment that these allegations are true, this conduct is insufficient to constitute the coercive type of practice that gives rise to a monopoly claim if the primary market is competitive and potential customers are not locked in to unanticipated high prices. *See Jefferson Parish*, 466 U.S. at 17, 104 S.Ct. at 1561 (when seller does not have either the degree or kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the first, tying product, antitrust violation can be established only by evidence of unreasonable restraint on competition in the relevant market); *Digital Equip. Corp. v. Uniq Digital Technologies, Inc.*, 73 F.3d 756 (7th Cir.1996)(refusal to sell to distributor for discount is not antitrust violation).

**3. Market Power.** Market power is defined as the power "to force a purchaser to do something he would not do in a competitive market." *PSI*, 104 F.3d at 817. Market power is generally measured by market share. *Jefferson Parish*, 466 U.S. at 27, 104 S.Ct. 1551.[17] The appropriate query is "whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 504, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969). If the seller has sufficient power in the tying market to "force" the buyer to purchase the tied product, then competition on the merits is restrained and the Sherman Act is violated. *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. at 1558. Without market power, the seller is unable to engage in the forcing necessary to establish a section 1 violation. *PSI*, 104 F.3d at 818.

In this case, the plaintiffs have focused on the parts and service aftermarket and have provided no data regarding the primary equipment market. The only market-share evidence of record shows that the primary equipment market was and is competitive. In 1993 for example, Bear and Allen's combined share of the automotive diagnostic equipment market was 26 percent. Market shares below 30 percent are generally insufficient, as a matter of law, to constitute market power in tying and monopolization cases. *E.g., Jefferson Parish*, 466 U.S. at 26–29, 104 S.Ct. 1551; *PSI*, 104 F.3d at 820 (granting summary judgment as to market power in monopolization and tying case where defendant had 27 percent share of primary equipment market); *ABA Section of Antitrust Law, Antitrust Law Developments* (Fourth) Vol. I, at 194 (1997)(since *Jefferson Parish* no court has accepted a market share below 30 percent as evidence of sufficient market power to warrant application of per se rule). Consequently, the plaintiffs cannot establish this fourth element of their tying claim.

**4. Anticompetitive Effects on Tied Market.** The fourth *Amey* element—anticompetitive effects in the tied market—is properly analyzed in terms of the price of the tied and tying bundle. Thus, the plaintiffs must establish that the combined price for the tying and tied products was greater than if they had been sold independently. *Kypta v. McDonald's Corp.*, 671 F.2d 1282 (11th Cir.1982).

> [I]njury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value. The rationale behind this requirement is apparent: A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the [defendant] for the tying product. Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no

---

**17.** Market power can also be demonstrated by direct evidence that defendants raised prices and drove out competition in the tied product market. *Wilson v. Mobil Oil Corp.*, 984 F.Supp. 450, 1997 WL 675326 (E.D.La.1997). No such evidence has been presented in this case.

injury can be claimed; suit then would be foreclosed.

*Id.* at 1285. Under *Kypta* then, even if the defendants had unreasonably restricted the availability of their parts, causing high prices for parts, Metzler and Bear cannot prevail on their tying claim unless they show that the defendants' service rates were supracompetitive, resulting in a higher package price for parts and service. The Court finds that the plaintiffs have totally failed to meet this burden. To the contrary, the undisputed evidence establishes that customers did not pay supracompetitive rates for the "tied product," that is, service for defendants' automotive diagnostic equipment. Defendants' service rates are and have been virtually the same as plaintiffs' service rates.[18] Consequently, the plaintiffs have not established this essential element of a tying claim.

> Plaintiffs did not claim, let alone offer evidence to show, that the price they paid for the franchise-computation package is higher than the price for those two products purchased in separate markets.... They therefore failed to show market power directly. *Kypta* ... holds that unless ... the package price was elevated the suit must be dismissed without further ado.

*Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 673 (7th Cir.1985). *Accord United Farmers Agents Ass'n v. Farmers Ins. Exchange*, 89 F.3d 233, 237 (5th Cir.1996)(affirming summary judgment, noting "plaintiffs have failed to even allege that the tied bundle ... cost more than the sum of their market prices.").

Even if the defendants did charge supracompetitive prices, the plaintiffs burden does not stop there. They must also establish a causal relationship between defendants' actions and plaintiffs' injury. A tying arrangement is illegal if it (1) has an actual anticompetitive effect or threatened to have such an effect and (2) that effect is not outweighed by procompetitive justifications. *Jefferson Parish*, 466 U.S. at 29–31, 104 S.Ct. 1551; *Le-*

*vine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir.). Without showing a clear connection between the alleged tie and an actual injury, plaintiffs cannot withstand summary judgment.

> We simply hold that a plaintiff may not proceed to trial simply because it presents some evidence that the defendant is engaged in tying and some evidence that some injury is occurring. A plaintiff must link the two showings with a theory of causation that is both plausible and cognizable by the antitrust laws.

*Town Sound and Custom Tops, Inc.*, 959 F.2d 468, 486–87 (3rd Cir.1992).

Plaintiffs present no evidence of failure of the market. The report by their expert, Dr. Seaman, presents no factual findings regarding the industry at issue, the market definition, or the causal relationship between the alleged conduct and the alleged injury. Dr. Seaman merely concludes that "This unique near absence of ISO's from automotive equipment servicing *is consistent with* plaintiff's arguments in this case that the behavior of the defendants has had the effect of excluding competitors ...."[19] But the absence of ISOs may also be consistent with legal, procompetitive behavior. *See e.g.*, George Vetter, *Vertical Restraints Post Kodak* 43 R.I. B.J. 7 (1994)("vertical restraints may actually enhance competition, particularly among interbrand competitors"). Dr. Seaman merely assumes the cause-and-effect relationship, rather than substantiates it. His testimony is ambiguous. Consequently, the plaintiffs cannot defeat summary judgment. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.").

**5. Amount of interstate commerce.** The fifth requirement for a tying arrangement is that a "not insubstantial" amount of interstate commerce be involved. The defen-

---

**18.** As stated in the facts section of this opinion, Bear and ATP's hourly rate for service was $85 from 1989 until 1996; it went to $90 in 1997. In comparison, plaintiffs' hourly rate from 1989 to 1993 was $75; it went up $5 in 1994 and again

in 1995 to equal to Defendants' pre–1997 rate of $85 per hour.

**19.** *Seaman Report* at ¶ 19 (emphasis added).

dants concede that this element has been met.

Because the plaintiffs cannot establish three out of the five essential elements of an illegal tying claim, the defendants are entitled to summary judgment on the section 1 claim. *See Retina Assoc., P.A. v. Southern Baptist Hosp.,* 105 F.3d 1376, 1385 (11th Cir.1997).

### A. THE MONOPOLY AND ATTEMPTED MONOPOLY CLAIMS.

The amended complaint alleges two claims under section 2 of the Sherman Act: a monopolization claim and an attempt to monopolize claim. Monopolization is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak,* 504 U.S. at 482–83, 112 S.Ct. at 2090 (quoting *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948)). A section 2 monopolization claim has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak,* 504 U.S. at 481, 112 S.Ct. at 2089 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). A section 2 claim requires a greater market share for a finding of market power than a section 1 claim. *PSI,* 104 F.3d at 821; *see United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)(87 percent share of relevant market constitutes a monopoly). A defendant can escape section 2 liability if the defendant's actions can be explained by legitimate business justifications. *See Eastman Kodak,* 504 U.S. at 483, n. 32, 112 S.Ct. at 2091, n. 32; *Times–Picayune Pub. Co. v. United States,* 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). As this Court found previously, in its section 1 analysis, the plaintiffs have not shown that the defendants possess market power in the primary equipment market. The plaintiffs therefore cannot prove their section 2 claim. This Court need not reach the second part of the section 2 monopoly analysis, that the defendants willfully acquired or maintained an alleged monopoly.

To prove an attempt to monopolize claim under section 2, a plaintiff must show that (1) the defendant engaged in predatory or anticompetitive conduct, (2) the defendant had the specific intent to monopolize, and (3) there was a dangerous probability that the defendant might achieved monopoly power. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *Technical Resource Servs., Inc.,* 134 F.3d at 1466; *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 993 (11th Cir.1993). Proof of a dangerous probability of successful monopolization necessarily involves a determination of the relevant market and the defendant's power in that market. *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. at 892 ("demonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographical market and the defendants' economic power in that market"; *see also U.S. Anchor Mfg.,* 7 F.3d at 994; *T. Harris Young & Assocs. v. Marquette Electronics,* 931 F.2d 816, 823 (11th Cir.1991). In this case the relevant market is the primary equipment market. Nowhere do the plaintiffs allege, nor does the evidence show, that the defendants engaged in predatory or anticompetitive conduct in the primary equipment market. Consequently, this claim must also fail. *See PSI,* 104 F.3d at 821–22. Defendants are entitled to summary judgment on the section 2 claims.

### VII. COUNTS XI AND XII

Metzler and Allstate's have also plead state-law claims for tortious interference with a business relationship based on the exact same conduct underlying the antitrust claims. The elements of a claim for tortious interference with a business relationship under Florida law are: (1) the existence of a business relationship; (2) defendant's knowledge of that relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff. *Pyles v. United Air Lines, Inc.,* 79 F.3d 1046, 1049 (11th Cir.

1996); *Tamiami Trail Tours, Inc. v. Cotton,* 463 So.2d 1126 (Fla.1985). A plaintiff must prove each element to recover for tortious interference. *See Pyles,* 79 F.3d at 1049.

■ Lawful competitive practices are privileged under Florida tortious interference law. *Wackenhut Corp. v. Maimone,* 389 So.2d 656, 658 (Fla. 4th DCA 1980). As long as no improper means are employed, business activities taken to safeguard or promote one's own financial interests are not actionable. *Ethyl Corp. v. Balter,* 386 So.2d 1220, 1225 (Fla. 3d DCA 1980); *accord Perez v. Rivero,* 534 So.2d 914, 916 (Fla. 3d DCA 1988).

■ This Court has held that the defendants' conduct was not illegal under the antitrust laws. Plaintiffs have set forth no facts showing any other independent basis for finding the defendants' acts wrongful or tortious under state law. If the defendants' conduct is not wrongful or illegal, it is justified. Plaintiffs therefore cannot prove the third element of its claim—intentional and unjustified interference with a relationship by the defendant. Admittedly some conduct not in violation of the antitrust laws may constitute tortious interference. But where the tort is grounded on precisely the same "anticompetitive" behavior alleged in the failed antitrust claim, it cannot as a matter of law constitute tortious interference with a business relationship. *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island,* 883 F.2d 1101, 1114 (1st Cir.1989)(antitrust law provides best barometer of whether alleged anticompetitive behavior can be found "wrongful" and hence tortious under state law); *Maxim Integrated Prods., Inc. v. Analog Devices, Inc.,* 1994 WL 514024 (N.D. Calif.1994)(where alleged interference involves same conduct as the antitrust violations, plaintiff's inability to raise a genuine issue on its antitrust claims dooms its state law interference claim); *Aviani v. Sisters of St. Mary,* 1987 WL 18934 (N.D.Ill.1987)(summary judgment granted in favor of defendant on tortious interference claim where tort was based on conduct found to be not an illegal restraint of trade). *See also Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422 (9th Cir.1993)(defendant's

conduct that did not violate the antitrust laws was privileged competition which could not give rise to tortious interference claim). Consequently, the defendants are entitled to summary judgment on Counts XI and XII.

## VIII. CONCLUSION

The plaintiffs' claims are insufficient to support a finding of illegal tying or monopoly. The evidence, construed in the light most favorable to the plaintiffs, shows that the defendants refused to sell parts to ISOs, tied the sale of some internal parts to service, and that some internal parts are available only from the defendants. But where, as here, the defendant lacks market power in the primary equipment market, there must be a showing of a restrictive change in policy or other coercive practice that enabled the manufacturer to exploit customers by charging supracompetitive prices. One reason for this result is that manufacturers of technical durable goods typically service a monopoly-like share of the installed parts to their own equipment. Published estimates show that 84 percent of mini-computers, 80 percent of ultrasound equipment, 90 percent of MRIs, and 70 percent of CT scanners are serviced by the manufacturer. Daniel M. Wall, *Aftermarket Monopoly Five Years After Kodak,* 11 Antitrust 32 (Summer 1997). Moreover, such manufacturers typically "monopolize" at least some of the parts to their equipment.

> [This type of Monopoly] is an almost inevitable by-product of innovation or attempts to create product differentiation; some key components will have been specifically engineered, may be protected by intellectual property rights, and are therefore not produced by anyone else. The typical manufacturer will have not one, but two or more (maybe dozens, if many parts are unique) "aftermarket monopolies."

*Id.* at 32–33.

In the aftermath of *Kodak,* courts and commentators alike have focused on the significance of Kodak's change in policy which enabled Kodak to coerce existing customers into paying service prices that were higher than reasonably anticipated at the time of contracting. They have noted that customers are entitled to the benefit of their reasonably anticipated bargain. A mid-stream poli-

cy change is an opportunistic act. In this case, however, there was no mid-stream change in policy. The defendants' longstanding business practices are "common knowledge." Plaintiffs have failed to show that the defendant engaged in the type of blatant opportunism found in *Kodak.* Furthermore, there is no evidence to support a finding that the defendants charged supracompetitive or even higher-than-anticipated prices. Higher-than-anticipated prices is a critical missing element. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ at 168 (1996) (if defendant lacks market power in the primary market, to survive summary judgment, plaintiff must show that price of defendants' entire package was noncompetitive); *See also Digital,* 73 F.3d at 761; *Kypta,* 671 F.2d at 1286 (same). Although market market imperfections exist, they are not the type that are of concern to antitrust laws. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that summary judgment is granted in favor of the defendants on the antitrust counts and the tortious interference claims that are based on the conduct underlying the antitrust claims.[20]

---

**20.** Counts 7 through 10 assert that the federal antitrust violations of Florida Statute sections 542.18 or 542.19. Florida's antitrust statutes are based on, and must be construed in accordance with, the federal statutes. Fla. Stat. Section 542.32. For this reason, defendants are entitled to summary judgment on the state antitrust claims. *Levine v. Central Fla. Med. Affiliates, Inc.,* 72 F.3d 1538, 1556 n. 20 (11th Cir.1996).